ANDREW L. PACKARD (State Bar No. 168690)
MEGAN E. TRUXILLO (State Bar No. 275746)
JOHN J. PRAGER (State Bar No. 289610)
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
E-mail: Andrew@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE, a non-profit
corporation,

　　　　　　　Plaintiff,

　　vs.

JEFFREY BEARD, in his official capacity as
Secretary of the California Department of
Corrections and Rehabilitation,

　　　　　　　Defendant.

Case No. **2:13-CV-00840-GEB-DAD**

**STIPULATION TO DISMISS
PLAINTIFF'S CLAIMS WITH
PREJUDICE; [PROPOSED] ORDER
GRANTING DISMISSAL WITH
PREJUDICE [FRCP 41(a)(2)]**

　　　　Plaintiff California Sportfishing Protection Alliance ("CSPA") and Defendant Jeffrey Beard, in his official capacity as Secretary of the California Department of Corrections and Rehabilitation ("Defendant") in the above-captioned action, stipulate as follows:

　　　　WHEREAS, on or about February 8, 2013, CSPA provided Defendant with a Notice of Violations and Intent to File Suit ("60-Day Notice Letter") under Section 505 of the Federal Water Pollution Control Act ("Act" or "Clean Water Act"), 33 U.S.C. § 1365;

　　　　WHEREAS, on April 29, 2013 CSPA filed its Complaint against Defendant in this Court, and said Complaint incorporated by reference all of the allegations contained in CSPA's 60-Day Notice Letter;

　　　　WHEREAS, CSPA and Defendant, through their authorized representatives and without either adjudication of CSPA's claims or admission by Defendant of any alleged violation or other wrongdoing, have chosen to resolve in full by way of settlement the allegations of CSPA as set forth

- 1 -

in CSPA's 60-Day Notice Letter and Complaint, thereby avoiding the costs and uncertainties of further litigation.  A copy of the Parties' proposed consent judgment ("Consent Judgment") entered into by and between CSPA and Defendant is attached hereto as **Exhibit A** and incorporated by reference;

WHEREAS, CSPA has submitted the Consent Judgment via certified mail, return receipt requested, to the U.S. EPA and the U.S. Department of Justice ("the agencies") and the 45-day review period set forth at 40 C.F.R. § 135.5 has now expired;

NOW THEREFORE, IT IS HEREBY STIPULATED and agreed to by and between the Parties that CSPA's claims, as set forth in its 60-Day Notice Letter and Complaint, be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2).  The Parties respectfully request an order from this Court dismissing such claims with prejudice.  In accordance with Paragraph 16 of the Consent Judgment, the Parties also request that this Court retain and have jurisdiction over the Parties through September 30, 2017, for the sole purpose of resolving any disputes between the Parties arising under the Consent Judgment.

Dated: May 1, 2015                          Respectfully submitted,

                                            LAW OFFICES OF ANDREW L. PACKARD

                                            By: /s/ Andrew L. Packard_____
                                            Andrew L. Packard
                                            Attorneys for Plaintiff
                                            CALIFORNIA SPORTFISHING
                                            PROTECTION ALLIANCE

Dated: May 1, 2015                          KAMALA D. HARRIS
                                            Attorney General of California
                                            GAVIN G.MCCABE
                                            Supervising Deputy Attorney General
                                            ELLYN S. LEVINSON
                                            Deputy Attorney General

                                            By: /s/ Daniel S. Harris, Esq. _____
                                            DANIEL S. HARRIS
                                            *Attorneys for Defendant*
                                            *Jeffrey Beard, in his official capacity as*
                                            *Secretary of the California Department of*
                                            *Corrections and Rehabilitation*

**EXHIBIT A**

1  ANDREW L. PACKARD (State Bar No. 168690)
   MEGAN E. TRUXILLO (State Bar No. 275746)
2  JOHN J. PRAGER (State Bar No. 289610)
   Law Offices of Andrew L. Packard
3  100 Petaluma Blvd. N., Suite 301
   Petaluma, CA 94952
4  Tel: (707) 763-7227
   Fax: (707) 763-9227
5  E-mail: Andrew@packardlawoffices.com

6  Attorneys for Plaintiff
   CALIFORNIA SPORTFISHING
7  PROTECTION ALLIANCE

8
                    UNITED STATES DISTRICT COURT
9
                   EASTERN DISTRICT OF CALIFORNIA
10

11

12  CALIFORNIA SPORTFISHING              Case No. 2:13-CV-00840-GEB-DAD
    PROTECTION ALLIANCE, a non-profit
13  corporation,                         **[PROPOSED] CONSENT JUDGMENT**

14              Plaintiff,               (Federal Water Pollution Control Act,
                                         33 U.S.C. §§ 1251 to 1387)
15      vs.

16  Jeffrey Beard, in his official capacity as
    Secretary of the California Department of
17  Corrections and Rehabilitation,

18              Defendant.

19

20

21

22

23

24

25

26

27

28

**WHEREAS**, Plaintiff California Sportfishing Protection Alliance (hereinafter "CSPA") is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of California's waters;

**WHEREAS**, Defendant JEFFREY BEARD, in his official capacity as Secretary of the California Department of Corrections and Rehabilitation (hereafter "Defendant"), operates two separate prisons – Folsom State Prison ("FSP") and California State Prison-Sacramento ("CSP-SAC") – at a 1200-acre facility located at 100/300 Prison Road in Represa, California (the "Facility");

**WHEREAS**, CSPA and Defendant collectively shall be referred to as the "Parties;"

**WHEREAS**, the Facility collects and discharges storm water from the Facility directly into the American River immediately below the Folsom Dam (maps of the Facility are attached hereto as **Exhibits A, A-1, A-2, A-3 and A-4**, and incorporated herein);

**WHEREAS**, storm water discharges associated with industrial activity are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES"), General Permit No. CAS000001 [State Water Resources Control Board], Water Quality Order No. 91 13 DWQ (as amended by Water Quality Order 92-12 DWQ and 97-03-DWQ), issued pursuant to Section 402 of the Federal Water Pollution Prevention and Control Act (the "Clean Water Act"), 33 U.S.C. § 1342 (hereinafter "General Permit").[1]  The Facility is enrolled under the General Permit, WDID No. 5S34I001227;

**WHEREAS**, on or about April 13, 2012, Defendant received from the Regional Water Quality Control Board, Central Valley Region ("Regional Water Board") a Water Code Section 13267 Order for Technical Report (the "Regional Water Board Order," a true and correct copy of which is attached hereto as **Exhibit B** and incorporated herein) discussing exceedances of United States Environmental Protection Agency ("EPA") parameter benchmark values for Total

---

[1] The Parties acknowledge that the California State Water Resources Control Board on April 1, 2014 adopted Order No. 2014-0057-DWQ, NPDES No. CAS000001, *National Pollutant Discharge Elimination System General Permit for Storm Water Discharges Associated with Industrial Activities* (the "2014 General Permit"), which is effective July 1, 2015

[PROPOSED] CONSENT JUDGMENT                    Case No.  (2:13-CV-00840-GEB-DAD)

1   Suspended Solids (TSS), Iron, Zinc, Nitrate + Nitrite as Nitrogen, and Aluminum, as reported by

2   Defendant in its 2010-2011 Annual Report to the Regional Water Board.  (A table of the

3   sampling parameters required under this Consent Agreement ("Agreement"), the EPA parameter

4   benchmark values and the Numeric Action Levels associated with those parameters and the

5   sampling test methods to be used, is attached hereto as **Exhibit C** and incorporated herein.)  The

6   Regional Water Board Order identified the Facility by the Standard Industrial Classification

7   ("SIC") Codes for Fabricated Metal Products (3499), Motor Vehicles and Passenger Car Bodies

8   (3711) and Commercial Printing, NEC (2759), which establish the Facility's sampling and

9   reporting requirements.  The Regional Water Board Order directs the Facility to submit a report

10  identifying the source of pollutants believed to be causing or contributing to exceedances of

11  parameter benchmark values for Total Suspended Solids (TSS), Iron, Zinc, Nitrate + Nitrite as

12  Nitrogen, and Aluminum and describing proposed upgraded Best Management Practices

13  ("BMPs") that will be implemented to reduce or eliminate the discharge of these pollutants in

14  storm water discharges from the Facility;

15       **WHEREAS**, on or about February 8, 2013, Plaintiff provided notice of Defendant's

16  alleged violations of the Act ("Notice Letter"), and of its intention to file suit against Defendant,

17  to the Administrator of the EPA; the Administrator of EPA Region IX; the U.S. Attorney

18  General; the Executive Director of the State Water Resources Control Board ("State Board"); the

19  Executive Officer of the Regional Water Board; and to Defendant, as required by the Act, 33

20  U.S.C. § 1365(b)(1)(A).  (A true and correct copy of CSPA's Notice Letter is attached as **Exhibit**

21  **D** and incorporated herein);

22       **WHEREAS**, CSPA filed its Complaint for Injunctive Relief ("Complaint") against

23  Defendant herein in the United States District Court, Eastern District of California, on April 29,

24  2013 (hereinafter "the Action");

25       **WHEREAS**, Defendant denies the allegations in the Notice Letter and the Complaint that

26  the Facility is in violation of the Clean Water Act or applicable permits;

27       **WHEREAS**, in response to the Regional Water Board's Order and CSPA's Notice Letter

28  and Complaint, Defendant represents that it has undertaken a comprehensive evaluation of the

2

1   Facility's storm water management system to determine the source(s) and location(s) of

2   pollutants causing or contributing to the exceedances of parameter benchmark values specified in

3   the Regional Water Board Order and to propose improved BMPs to reduce or eliminate future

4   exceedances of parameter benchmark values or Numeric Action Levels in the Facility's storm

5   water discharges into the American River, some of which Defendant represents have already been

6   implemented or are in the process of being implemented, as described by Defendant, and not

7   CSPA, in **Exhibit E** attached hereto and incorporated herein;

8          **WHEREAS**, Defendant represents that, based on information, testing and analysis to date,

9   storm water discharges associated with industrial activities may have historically occurred at

10  certain locations at the Facility where inmate vocational education programs (involving metal

11  fabrication and printing, plumbing, carpentry and masonry), and vehicle maintenance and prison

12  industry operations (collectively, and for purposes of this Agreement only, the "Industrial

13  Activities") are attended or conducted by inmates, Facility employees, or employees or invitees of

14  the California Prison Industry Authority ("PIA").  Defendant represents that the Industrial

15  Activities most likely associated with the exceedances of EPA parameter benchmark values

16  specified in the Regional Water Board Order include metal fabrication and printing of license

17  plates and signs, other metal fabrication and welding, including the production of metal furniture

18  and modular buildings and structures, and vehicle repair and maintenance.  Defendant represents

19  that the Industrial Activities occur only at the following locations (collectively, the "Industrial

20  Areas," which are depicted on **Exhibits A-1, A-2, A-3, and A-4** attached hereto):

21      (1) FSP:  PIA License Plate Factory, PIA Metal Fabrication Building, PIA Warehouses

22  (including the Print Shop and the Sign Shop), and the PIA Modular Building Fabrication Shop;

23  the Plant Operations Warehouse (also referred to as the #3 Post Warehouse); Plant Operations at

24  the Lower Yard Hanger, including the Old Power House and various maintenance and vocational

25  shops (painting, plumbing, carpentry and masonry); and the Vehicle Maintenance Garage;

26      (2) CSP-SAC:  Main Receiving Warehouse (including the PIA Receiving Warehouse and

27  the Maintenance Warehouse); Plant Operations Building; and the Vehicle Maintenance Garage;

28

**WHEREAS,** Defendant represents that virtually all storm water discharged from the Facility into the American River, including from the Industrial Areas, passes through Outfalls A-D, as depicted in **Exhibit A** hereto;

**WHEREAS**, the Parties agree that it is in their mutual interest to resolve this matter without litigation and enter into this Agreement to do so;

**WHEREAS**, for purposes of this Agreement, (1) the Parties stipulate that venue is proper in this Court, and (2) that Defendant does not contest the exercise of jurisdiction by this Court to dismiss this matter with prejudice under the terms of this Agreement; however, notwithstanding the previous provisions of this sentence, Defendant's consent to the Court's jurisdiction as stated in this Agreement does not constitute a waiver of either Defendant's sovereign immunity under the Eleventh Amendment of the United States Constitution or Defendant's defense that there is a jurisprudential limitation on this Court's remedial jurisdiction to prospective injunctive or declaratory relief;

**WHEREAS**, this Agreement shall be submitted to the United States Department of Justice and the EPA for the forty-five (45) day statutory review period, pursuant to 33 U.S.C. § 1365(c) and 40 C.F.R. §135.5 (which period shall be referred to herein as the "Agency Review Period"), and shall thereafter be submitted for approval and entry by the District Court;

**WHEREAS**, upon expiration of the Agency Review Period, the Parties shall file with the Court a Stipulation and Proposed Order that will dismiss with prejudice the entire Complaint pursuant to Federal Rule of Civil Procedure 41, subdivision (a)(2), and retention of jurisdiction by the Court solely for the enforcement of this Agreement as provided herein (the date of entry of the Order to dismiss is referred to herein as the "Court Approval Date"); and,

**WHEREAS**, within ten (10) days from the date this Agreement is submitted for approval to the United States Department of Justice and the EPA, CSPA shall file a Notice of Settlement and inform the Court of the expected dismissal date.

///

///

4

**NOW, THEREFORE, IT IS HEREBY STIPULATED BY AND BETWEEN THE PARTIES AS FOLLOWS:**

**I.      COMMITMENT OF DEFENDANT**

**1.      Compliance With General Permit & Clean Water Act**.  Beginning immediately, and throughout the term of this Agreement, Defendant shall use his best reasonable efforts to operate the Facility in compliance with the requirements of the applicable General Permit and the Clean Water Act, subject to this Agreement and any defenses available under law.

**2.      Specific Storm Water Best Management Practices.**  Without conceding that the following constitute BMPs within the meaning of the Clean Water Act, upon the Effective Date of this Agreement, as defined below, Defendant agrees to implement the following storm water BMPs throughout the term of this Agreement, unless otherwise specified:

        **A.      _Storm Drain Inlet Treatment Device Installation, Inspection and Maintenance_.** Since December 2013, 112 storm drain inlet filters and wattles have been installed at strategic locations throughout the Facility.  Specifically, storm drain inlets have been fitted with REM Storm Water Filter Systems – Custom REM Filters configured with REM FOG, Granulated Carbon and Zeolite media strategy ("Treatment Devices"). The locations of the Treatment Devices installed to date are depicted in **Exhibit F** attached hereto and incorporated herein.  If the results of future storm water sampling indicate exceedances of then-applicable EPA parameter benchmark values or Numeric Action Levels for the pollutants or parameters specified in **Exhibit C**, the Facility shall evaluate whether to install Treatment Devices at additional storm drain inlets that have industrial activities associated with them.  Defendant will install additional Treatment Devices at those locations, if any, within sixty (60) days from the date of Defendant's receipt of such sample result.

        Prior to the Effective Date of this Agreement, Defendant had REM perform the initial inspection, cleaning, maintenance and replacement activities with respect to the Treatment Devices.  Defendant shall ensure that Facility staff continue to be trained by REM, or an equally qualified contractor, in the proper inspection and maintenance of the Treatment Devices.  Upon completion of training, Defendant shall ensure that Facility staff (or, in the

5

1   Facility's sole discretion, a qualified contractor retained by the Facility) conduct the inspections

2   and maintenance and all other activities relating to inlets and Treatment Devices.  All such

3   training sessions, inspections and maintenance activities will be recorded in a log and will be

4   incorporated in and maintained with the Facility SWPPP (or any required amendments,

5   modifications or updates thereto).

6   During the term of this Agreement, Defendant shall ensure that the Treatment Devices are

7   inspected once per quarter by Facility staff and/or a qualified contractor and such inspections

8   (which shall be logged in the SWPPP) shall be timed to ensure that one of the quarterly

9   inspections of the Treatment Devices occurs within the month of September 2015 and another

10   one occurs within the month of September 2016.  Defendant shall ensure that the Treatment

11   Devices are cleaned or replaced as needed and in accordance with manufacturer's guidelines.

12   Defendant shall ensure that design flows are calculated to ensure that all inlet protection devices

13   have sufficient flow capacity.

14   *Signage at storm drain inlets*:  Standard storm drain inlet decals[2] will be placed on all

15   Facility drain inlets in a manner to inform staff and inmates of the location of the inlets and to

16   prohibit dumping of any kind into the storm drains or inlets so Facility staff or inmates have an

17   immediate visual understanding that indicates the direct connection to the American River and

18   that no dumping into the storm drain should occur.

19   **B.**   ***Improved Training & Housekeeping Practices.***  Defendant shall clean all tools and

20   machines related to any Industrial Activities in designated cleaning areas (to be determined and

21   indicated in the Facility SWPPP by the Facility in its sole discretion), with all related wash waters

22   directed to the sanitary sewer.  All Industrial Areas shall be maintained, and all Industrial

23   Activities thereon conducted, in such a manner so as to reasonably attempt to meet applicable

24   standards under the then-applicable General Permit and applicable law intended to reduce or

25   eliminate the risk of improper disposal or discharge of the pollutants specified in **Exhibit C**

26   hereto into the Facility storm drain system.

27

28
_____

[2] An exemplar of this storm drain inlet decal is attached hereto as **Exhibit G.**

6

1    Good housekeeping practices training for all staff and inmates involved in Industrial

2 Activities at the Facility began in September 2013 and is ongoing.  Defendant shall continue such

3 training on a quarterly basis for all employees and inmates involved in Industrial Activities at the

4 Facility, instructing them that all such wash waters are strictly prohibited from being discharged

5 to the storm drain system, with such training sessions recorded in a log to be incorporated in and

6 maintained with the Facility SWPPP.

7    The training has and will continue to consist of formal classroom training and/or training in

8 the field, and will vary as appropriate depending on the audience and circumstances (for example,

9 program managers/supervisors, staff, or inmates involved in Industrial Activities at the Facility).

10 All Facility staff, PIA staff, and inmates who in the future participate in any Industrial Activities

11 will receive training prior to participating in such activities.  Program managers/supervisors will

12 receive training from one of the Facility's Hazmat Specialists; staff and inmates will receive

13 training from their immediate supervisors in the form of an annual safety meeting and quarterly

14 update meetings, or more frequently, if necessary.  Training will also take the form of permanent

15 signage with relevant housekeeping practices for proper cleanup and disposal of metals and other

16 wastes and appropriate activities around storm drains and inlets.

17    **C.**    ***Storage/Protection of Metals and Other Industrial Materials.***  All metals or other

18 raw or recycled materials used in the Industrial Activities at the Facility that could cause or

19 contribute to exceedances of EPA parameter benchmark values or Numeric Action Levels for any

20 pollutant or parameter listed in **Exhibit C** hereto are or will be stored inside a building or

21 otherwise protected from contact with precipitation and storm water, and such protection

22 measures shall be inspected prior to anticipated precipitation and throughout the Wet Season

23 (which the General Permit defines as October 1 to May 30 (the "Wet Season")).  Defendant will

24 continue to construct additional permanent roofed storage structures where feasible, with a goal

25 toward providing adequate precipitation and storm water protection for all materials stored, used

26 or disposed of at the Facility that could cause or contribute to exceedances of EPA parameter

27 benchmark values or Numeric Action Levels for any pollutant or parameter listed in **Exhibit C**

28 hereto.

7

1       **i.**     *Improved Disposal of Metal Materials and Protection of Waste Bins and*

2   *Dumpsters.*   All metal scraps, waste, and dust related to Industrial Activities will be placed in

3   containers that protect the contents from exposure to precipitation or storm water. Such metal

4   scraps, waste and dust shall not be swept or blown out of buildings or washed out into the storm

5   drain system. In accordance with Paragraph 2(B) hereof, Facility staff, PIA staff, and all inmates

6   involved in Industrial Activities at the Facility will continue to be trained in the proper disposal of

7   metal scraps, waste and dust, and appropriate signage shall be posted permanently and

8   conspicuously in all Industrial Areas where metals are used, stored or disposed.

9       **D.**     *Improved Facility-wide Regenerative Sweeping Program.*   The Facility shall arrange

10  for a qualified contractor to perform regenerative sweeping services on all paved roadways and

11  surfaces immediately in, around, to or from the Industrial Areas. The regenerative sweeping shall

12  be performed once every forty-five (45) days throughout the remainder of the 2014-2015 Wet

13  Season and during the 2015-2016 and 2016-2017 Wet Seasons, and once within fifteen (15) days

14  prior to the 2015-2016 and 2016-2017 Wet Seasons, and a log recording all sweeping shall be

15  incorporated in and maintained with the Facility SWPPP.

16      **E.**     *Ongoing Metals Source Identification and Investigation.*   Defendant shall continue

17  to investigate other possible sources of Aluminum, Iron and Zinc if, after implementation of the

18  BMPs described herein, storm water discharges from the Facility exceed EPA parameter

19  benchmark values or Numeric Action Levels for those pollutants. Defendant will collect and

20  analyze wipe samples (or such other appropriate and industry-accepted sampling test or analysis)

21  from potential sources such as galvanized metal fencing and building/structural materials at the

22  Facility linked to any Outfall(s) exhibiting exceedances of EPA parameter benchmark values or

23  Numeric Action Levels. Defendant shall further evaluate such test results and take appropriate

24  and feasible action necessary to reduce or eliminate discharge levels below applicable EPA

25  parameter benchmark values or Numeric Action Levels (by way of example only, painting or

26  otherwise sealing or replacing galvanized roofs or other structures determined to cause or

27  contribute to an exceedance of any EPA parameter benchmark value).

28

[PROPOSED] CONSENT JUDGMENT                 Case No. (2:13-CV-00840-GEB-DAD)

**F.**   ___Nitrate Source Identification and Reduction.___   Defendant has been working to identify the source(s) of any Nitrates and Nitrites as Nitrogen (hereafter "Nitrates") discharged from the Facility and evaluating appropriate methods to reduce such Nitrate discharges into the storm water system.  Based on information obtained to date, the primary sources of Nitrates are, in Defendants' view, but not in CSPA's view, Canadian geese feces and background levels in groundwater under the Facility and, secondarily, human sanitary waste entering the storm drain system through Outfall B.  Unless the Regional Water Board determines otherwise, Defendant shall implement the following BMPs in an effort to reduce storm water discharges of Nitrates:

**i.**   ___Canadian Geese.___   Canadian geese have a large presence at the Facility and deposit large quantities of nitrogen-containing feces.  In January 2014, all Facility employees were advised orally and/or in writing about the Nitrate/goose feces issues and prohibited from feeding any geese.  In addition, the sweeping and collection of goose feces commenced in areas containing significant numbers of geese.  On March 3, 2014, the Facility received a permit from the California Department of Fish and Wildlife to commence Canada goose nest and egg addling and destruction.  On April 7, 2014, the Facility received a depredation permit from the United States Fish and Wildlife Service.  Defendant also has been working with the United States Department of Agriculture to commence the depredation process to include removal of Canadian geese from the Facility. Defendant will continue these efforts and explore other reasonable measures, as appropriate, to reduce the goose population and its impacts on the Facility's storm water system, with a log recording all such efforts to be incorporated in and maintained with the Facility SWPPP.

**ii.**   ___Human Sanitary Waste.___   Defendant has conducted an investigation of some inlets to Outfall B to locate and identify potential source(s) of human-related Nitrate discharges, including groundwater inputs and whether there are additional drain inlet inputs.  Defendant has continued this process by conducting a physical investigation of the Outfall B tunnel (known as "Godwin Tunnel") and collecting Nitrate and fecal coliform samples from Outfall B at lateral tie-in locations and obtained a sample (with a bailer or pump hose) from the vertical deep shaft on the southeast side of the prisoner housing complexes.  Following the initial physical inspection, a

9

1   subsequent inspection of the Outfall B tunnel was conducted and no cross-connections were

2   observed that would contribute to the source of Nitrates in the storm water; however, an

3   underground leak in the potable hot water system that services Building 5 was identified and

4   repaired.  Defendant shall continue to investigate the Outfall B tunnel and take appropriate

5   corrective action, if any, if future sampling results indicate it may be a source of Nitrates.

6   Defendant shall also investigate whether the waste waters from outdoor shower areas are

7   adequately contained and flowing into dedicated sewer lines rather than storm water drains.

8   Defendant shall evaluate all such test results and will make repairs as appropriate and necessary

9   to reduce or eliminate discharge levels of Nitrates relative to the applicable EPA parameter

10  benchmark value.  Where it does not create a safety or security concern, Defendant shall ensure

11  that outside showers and toilets are enclosed or protected from coming into contact with

12  precipitation or storm water, and that the discharge or disposal of any waste waters from such

13  showers or toilets cannot reach the storm drain inlets.  Defendant shall also investigate the sewer

14  lines in the housing units around the FSP facility main yard and the health services building to

15  assess for leaks or cross connections, and shall make any appropriate repairs, if any.

16          **iii.**     ***Storage of Landscaping Equipment and Materials.***  All landscape equipment

17  and fertilizer used at the Facility shall be stored either inside a building or other roofed structure

18  or otherwise protected from coming into contact with precipitation or storm water and potentially

19  discharge into storm drains.  Defendant shall reduce the application of fertilizers or mulches that

20  contain Nitrates to the minimum required to keep alive plants, trees and other landscaping at the

21  Facility, the amount of such fertilizer or mulch to be determined in the sole discretion of

22  Defendant or his designee.

23          **iv.**     ***Cleaning/Dredging of Outfalls.***  Prior to the 2014-2015 Wet Season,

24  Defendant cleaned and dredged Outfalls A-1 and D, including the so-called "upper river outfall,"

25  to remove stagnant sediment or other potential contaminant sources that may discharge into the

26  storm water system or interfere with the operation of the outfalls.  Defendant will evaluate in

27  future sampling whether these efforts are effective in reducing concentrations of Nitrates in storm

28  water discharges from the Facility.

[PROPOSED] CONSENT JUDGMENT                              Case No.  (2:13-CV-00840-GEB-DAD)

**G.** *__Total Suspended Solids/Sediment and Erosion Control; Storm Drain Cleaning and Vacuuming.__*  In order to prevent the accumulation and potential discharge of total suspended solids, such as sediment, silt and trash, into storm drains at the Facility, Defendant will, at least four (4) times per year on a quarterly basis, inspect all reasonably accessible storm drains for sediment build-up or other obstructions.  Defendant will then "jet" and/or vacuum clean all reasonably accessible storm drain pipes and inlets found to have obstructions prior to the Wet Season.  Defendant will take reasonable steps to ensure that all waste from the cleaning process will be properly disposed of (for example, by temporarily storing such waste in 55-gallon drums or bins for water characterization and disposal) and will be prevented from entering the storm water drain system or flowing directly into the American River.

  **i.** *__Erosion Control.__*  Defendant shall investigate on an annual basis prior to the Wet Season whether the Facility has any areas at least one-tenth of an acre in size, that have potentially erodible soils during rain storms that could lead to the accumulation of sediment or other suspended solids in the storm drain system.  Defendant shall implement appropriate surface protection for such identified areas including, but not limited to, the application of gravel and/or installation of wattles, filters or other trapping mechanisms, to slow down and filter the flow of sediment or other suspended solids before entering the storm drain system.

**3.** **SWPPP  Revisions.**  Within thirty (30) days of the Court Approval Date for this Agreement, Defendant shall formally amend the Facility SWPPP to incorporate all of the relevant requirements of this Agreement.

**4.** **Storm Water Sampling Frequency.**  Weather permitting (i.e., there are sufficient Qualifying Storm Events, as such term is defined for sampling purposes in the then-applicable General Permit), and subject to the provisions of the following paragraph, Defendant shall collect and analyze samples of the parameters listed in **Exhibit C** from three (3) Qualifying Storm Events during the 2014-2015 Wet Season, and from five (5) Qualifying Storm Events during the 2015-2016 Wet Season (except that, at Defendant's option, one (1) of the five (5) samples from a Qualifying Storm Event for 2015-2016 may occur during the months of July, August or September 2015 or June 2016).

1    The storm water sample results shall be compared with the EPA parameter benchmark

2    values or Numeric Action Levels applicable at the time when the samples are taken.  If the results

3    of any such samples exceed the EPA parameter benchmark values or Numeric Action Levels set

4    forth in **Exhibit C**, Defendant shall comply with the "Action Memorandum" requirements set

5    forth below.  If the results of all such samples from the 2014-2015 Wet Season for all of the

6    parameters listed in **Exhibit C** do not exceed the EPA parameter benchmark values set forth in

7    **Exhibit C**, and all required sampling is undertaken, then notwithstanding any provision of the

8    preceding paragraph to the contrary, Defendant shall only be required under this Agreement to

9    collect and analyze samples for the parameters listed in **Exhibit C** from four (4) Qualifying Storm

10   Events during the 2015-2016 Wet Season.  Notwithstanding any provision of this Agreement to

11   the contrary, Defendant has no obligation under this Agreement to sample for Specific

12   Conductance after the 2014-2015 Wet Season.

13   **5.    Sampling Parameters and Analytical Methods.**  All samples of the parameters listed in

14   **Exhibit C** shall be analyzed by a laboratory accredited by the State of California.  All samples

15   collected from the Facility shall be delivered to the laboratory as soon as possible to ensure that

16   sample "hold time" is not exceeded.  The analytical methods to be employed on the storm water

17   samples taken pursuant to Paragraph 4 hereof shall be any of the methods listed in **Exhibit C**,

18   which are derived from 40 CFR section 136.3 and Table 2 of the 2014 General Permit.  For the

19   term of this Agreement, sampling results shall be provided to CSPA within seven (7) business

20   days of Defendant's receipt of the laboratory report from each sampling event pursuant to the

21   Notice provisions below.

22   **6.    Action Memorandum Trigger; CSPA Review Of Action Memorandum; Meet-and-**

23   **Confer.**  If any sample taken pursuant to Paragraph 4 of this Agreement exceeds the EPA

24   parameter benchmark values or Numeric Action Levels set forth in **Exhibit C**, then Defendant

25   shall prepare a written statement reporting any exceedance(s), if any, and discussing the possible

26   cause(s) and/or source(s) of the exceedance(s), and proposing additional measures, if any, that

27   will be taken to address and eliminate future exceedances of the applicable parameter benchmark

28   values or Numeric Action Levels ("Action Memorandum").  Recognizing that a SWPPP is an

12

1   ongoing iterative process meant to encourage innovative BMPs, such additional measures may

2   include, but are not limited to, taking confirmation samples, further material improvements to the

3   storm water collection and discharge system, changing the type and frequency of Facility

4   sweeping, changing the type and extent of storm water filtration media or modifying industrial

5   activities or management practices at the Facility.  If there are a sufficient number of Qualifying

6   Storm Events in a given Wet Season and Defendant fails to collect and analyze samples pursuant

7   to Paragraph 4 hereof, Defendant will provide an Action Memorandum pursuant to this paragraph

8   setting forth the reasons why such samples were not taken and when such sampling will occur.

9   Any Action Memorandum shall be provided to CSPA not later than July 15 following the

10  conclusion of each Wet Season.  CSPA may, but is not required to, review and comment on an

11  Action Memorandum and suggest any additional pollution prevention measures it believes are

12  appropriate, which CSPA acknowledges are not binding on Defendant and do not serve as the

13  basis for a material breach of this Agreement.  Upon request by CSPA, Defendant agrees to meet

14  and confer in good faith for up to eight (8) hours, at a mutually agreed upon date, time and

15  location, regarding the contents and sufficiency of the Action Memorandum.

16       Defendant shall begin the process of implementing any additional measures proposed by

17  Defendant in the Action Memorandum, and any additional measures suggested by CSPA and

18  agreed to by Defendant in his sole discretion, pursuant to this paragraph, to the extent feasible, as

19  soon as possible and in no event later than sixty (60) days after the due date of the Action

20  Memorandum, unless the Warden for each prison determines implementation within such time

21  period is not feasible due to safety and security priorities.  Within fourteen (14) days of

22  implementation, the Facility SWPPP shall be amended to include all additional BMP measures

23  designated in the Action Memorandum.

24  **7.    Inspections by CSPA During The Term Of This Agreement.**   Defendant shall permit

25  representatives of CSPA to perform one (1) physical inspection of the Facility during the term of

26  this Agreement (the exact date to be selected by CSPA and confirmed by Defendant pursuant to

27  this paragraph) for purposes of ensuring Defendant's compliance with this Agreement or

28  concerning an Action Memorandum as set forth above in Paragraph 6 hereof.  The duration of

13

1   any inspection shall not exceed six (6) consecutive hours, and shall be limited to those locations

2   within the Facility reasonably necessary to inspect:  (a) the Industrial Areas and the storm drain

3   system, including any outfalls, (b) BMPs implemented pursuant to Paragraph 3 hereof, and (c)

4   any other suspected source(s) of pollutants (as agreed upon by the Parties during the meet and

5   confer process pursuant to Paragraph 6 hereof) for which the sampling results (pursuant to

6   Paragraph 4 hereof), if any, exceed the applicable EPA parameter benchmark value or Numeric

7   Action Level set forth in **Exhibit C** hereto.

8          The inspection described above shall be performed by CSPA's counsel and consultants (up

9   to three (3) individuals) and are limited to visual inspection of the relevant areas of the Facility

10   (as described in the preceding paragraph), and may also include, at CSPA's option, non-

11   destructive sampling of water discharged into or from the storm water system and/or surfaces

12   adjacent to storm drain inlets and/or Industrial Activities, as well as the taking of photographs

13   and/or video of the storm water system and Industrial Activities, but only to the extent approved

14   by the Facility to preserve safety and security; alternatively, CSPA may request photographs

15   and/or video from Defendant that depict (a) the BMPs implement pursuant to Paragraph 3 hereof,

16   and/or (b) the relevant areas described in the preceding paragraph).  CSPA shall provide

17   Defendant with a copy of all sampling reports, photographs and/or video.  CSPA agrees that all

18   information (including, but not limited to, photographs and video) obtained during any inspection

19   of the Facility under this Agreement, if any, shall be used solely in connection with the

20   performance or enforcement of this Agreement and shall not be disclosed or distributed to any

21   person other than the Parties' management, their counsel, and consultants (who are not authorized

22   to further disclose or distribute said information and shall be instructed accordingly) and, if

23   necessary, to the Court in connection with a motion to enforce this Agreement pursuant to

24   Paragraph 12 hereof; and, further, that any such information (including, but not limited to,

25   photographs and video) that may be submitted to the Court pursuant to Paragraph 12 hereof shall

26   first be reviewed by the Facility to preserve safety and security and if the submission of such

27   information would constitute a safety or security risk, in the Facility's sole good faith opinion,

28   then CSPA agrees to submit such information to the Court either under seal or for *in camera*

inspection only.  Notwithstanding any provision of the preceding sentence to the contrary, any storm water or other sample(s) taken by CSPA during an inspection pursuant to this Paragraph 7 may be sent by CSPA for analysis to a laboratory accredited by the State of California, which shall be instructed not to disclose or distribute the sample(s) or any information relating to such sample(s) except in accordance with this paragraph.

CSPA shall provide at least ten (10) business days advance notice of such physical inspection so Defendant has adequate time for security clearances to be performed, except that Defendant shall have the right to deny access if circumstances would make the inspection unduly burdensome and pose significant interference with business operations or any party/attorney, or the safety of individuals, or if Defendant is unable to timely clear for entry anyone inspecting the Facility within the requested time-frame.  In such case, Defendant shall specify at least three (3) dates within the three (3) weeks thereafter upon which a physical inspection by CSPA may proceed.

Defendant shall use best efforts to ensure that no alterations to Facility conditions related to or affecting the storm drain system are made during the period between receiving CSPA's initial advance notice and the start of CSPA's inspection that Defendant would not otherwise make but for receiving notice of CSPA's request to conduct a physical inspection of the Facility, excepting any actions taken in compliance with any applicable laws or regulations or any modifications, alterations or new construction at the Facility which are in process as of the date of CSPA's initial advance notice pursuant to this paragraph.  Nothing herein shall be construed to prevent Defendant from continuing to implement any BMPs identified in the SWPPP or this Agreement, or from making any alterations to Facility conditions unrelated to storm water management during the period prior to an inspection by CSPA or at any time.

**8.     Defendant Communications To/From Regional and State Water Boards.**  During the term of this Agreement, Defendant shall provide CSPA with copies of all documents submitted by Defendant to, or received from, the Regional Water Board or the State Water Board concerning storm water discharges containing the pollutants listed in **Exhibit C** from the Facility,

15

1  including, but not limited to, all documents and reports submitted to the Regional Water Board

2  and/or the State Water Resources Control Board as required by the General Permit.  Such

3  documents and reports shall be provided to CSPA pursuant to the Notice provisions set forth

4  below and contemporaneously with Defendant's submission(s) to, or receipt from, such agencies.

5  **9.     SWPPP Amendments.**  Pursuant to the Notice provisions set forth below, Defendant shall

6  provide CSPA with a copy of any amendments to the Facility SWPPP made during the term of

7  the Agreement within fourteen (14) days of such amendment.

8  **II.     COMPLIANCE MONITORING AND FEES AND COSTS**

9  **10.    Compliance Monitoring Funding.**  To defray CSPA's investigative, expert, consultant

10  and attorneys' fees and costs associated with monitoring Defendant's compliance with this

11  Agreement, Defendants agree to contribute $10,000 for each of the two Wet Seasons covered by

12  this Agreement to a compliance monitoring fund maintained by counsel for CSPA as described

13  below.  Payment in the amount of $20,000 shall be made payable to the "Law Offices of Andrew

14  L. Packard Attorney Client Trust Account" and remitted to Plaintiff's counsel. Defendant will

15  make a good-faith effort to pay the settlement amount within sixty (60) days from the later of the

16  Court Approval Date, the entry of the court-approved Stipulation and Order dismissing CSPA's

17  Complaint and the Action, or receipt by Defendant of all required payee data forms and other

18  information that Defendant may require to process the payment.  CSPA acknowledges that

19  payment may be delayed by the lack of a State budget, a funding shortfall despite a State budget,

20  the processing efforts of the State Controller's Office, and other events not attributable to or

21  within the control of Defendant.  Defendant shall complete and submit all necessary paperwork to

22  begin the processing of this payment within thirty (30) days of the Court Approval Date,

23  including a request that such processing be expedited if possible.  Compliance monitoring

24  activities may include, but shall not be limited to, site inspections, review of water quality

25  sampling reports, review of annual reports, discussions with representatives of Defendant

26  concerning any Action Memoranda referenced above in Paragraph 6, and potential changes to

27  compliance requirements herein, preparation for and participation in meet-and-confer sessions,

28  water quality sampling and analysis, and compliance related activities.

**11.     Reimbursement of Attorney Fees & Costs.**  Defendant agrees to reimburse CSPA in the amount of $84,350 to defray CSPA's investigative, expert, consultant and attorneys' fees and costs, and all other costs incurred as a result of investigating the activities at the Facility, bringing the Action and negotiating this Agreement.  CSPA certifies that the amount of fees and costs set forth in the preceding sentence accurately reflects legal work actually performed, at the rates specified in the Parties' negotiations, and costs actually incurred by CSPA, in connection with the Action and the negotiation of this Agreement.  Payment shall be made payable to the "Law Offices of Andrew L. Packard Attorney Client Trust Account" and remitted to Plaintiff's counsel. Defendant will make a good-faith effort to pay the settlement amount within sixty (60) days from the later of the Court Approval Date, the entry of the court-approved Stipulation and Order dismissing CSPA's Complaint and the Action, or receipt by Defendant of all required payee data forms and other information that Defendant may require to process the payment.  CSPA acknowledges that payment may be delayed by the lack of a State budget, a funding shortfall despite a State budget, the processing efforts of the State Controller's Office, and other events not attributable to or within the control of Defendant. Defendant shall complete and submit all necessary paperwork to begin the processing of this payment within thirty (30) days of the Court Approval Date, including a request that such processing be expedited if possible.

### III.     DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT AGREEMENT

**12.**     With the exception of the timelines set forth above for addressing exceedances of the EPA parameter benchmark values or Numeric Action Levels specified in **Exhibit C** and any Action Memoranda, if a dispute under this Agreement arises, or either Party believes that a material breach of this Agreement has occurred, the Parties shall meet and confer within fourteen (14) days of receiving written notification from the other Party of a request for a meeting to determine whether a material breach of this Agreement has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the dispute.  If the Parties fail to meet and confer, or the meet-and-confer does not resolve the issue, after at least ten (10) days have passed after the meet-and-confer occurred or should have occurred, either Party shall be entitled to all rights and

17

1    remedies under the law, including filing a motion with the District Court of California, Eastern

2    District, which shall retain jurisdiction over the Action up to the Termination Date of this

3    Agreement for the limited purposes of enforcement of the terms of this Agreement; however,

4    notwithstanding any other provision of the preceding sentence or this Agreement, CSPA waives

5    any and all rights and covenants and agrees not to file a new claim, action or proceeding of any

6    kind regarding storm water discharges from the Facility during the term of this Agreement and, if

7    CSPA does file such a new claim, action or proceeding, then this Agreement shall no longer be

8    enforceable by CSPA and Defendant shall be relieved immediately from any outstanding

9    obligations under this Agreement, in addition to any other rights or remedies Defendant may have

10    under law or in equity.  The Parties shall be entitled to seek attorney fees and costs incurred in

11    any such motion, and such attorney fees and costs shall be awarded pursuant to the provisions set

12    forth in the then-applicable federal Clean Water Act and applicable case law interpreting such

13    provisions.

14    **13.    CSPA's Waiver and Release.**  Upon the Court Approval Date of this Agreement, CSPA,

15    on its own behalf and on behalf of its members, subsidiaries, successors, assigns, directors,

16    officers, agents, attorneys, representatives, and employees, releases Defendant, and the California

17    Department of Corrections and Rehabilitation and its officers, directors, employees, subsidiaries,

18    and affiliates, and each of Defendant's and CDCR's predecessors, successors and assigns, and

19    each of their agents, attorneys, consultants, and other representatives (each a "Released Defendant

20    Party") from, and waives all claims which arise from or pertain to the Action, including, without

21    limitation, all claims for injunctive relief, damages, penalties, fines, sanctions, mitigation, fees

22    (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or

23    claimed or which could have been claimed in this Action, for the alleged failure of Defendant to

24    comply with the Clean Water Act at the Facility, up to the Termination Date, defined below.

25    **14.    Defendant's Waiver and Release.**  Upon the Court Approval Date of this Agreement,

26    Defendant, on his own behalf, releases CSPA (and its officers, directors, employees, members,

27    parents, subsidiaries, and affiliates, and each of their successors and assigns, and its agents,

28    attorneys, and other representative) from, and waives all claims which arise from or pertain to the

1   Action, including all claims for fees (including fees of attorneys, experts, and others), costs,

2   expenses or any other sum incurred or claimed or which could have been claimed for matters

3   associated with or related to the Action.

4   **15.     Federal Agency Review.**  Within five (5) business days of the execution of this

5   Agreement, defined below, CSPA will submit the Agreement to the United States Department of

6   Justice and EPA for the statutory 45 day Agency Review Period set forth in 33 U.S.C. §1365(c)

7   and submit a Notice of Settlement to the Court.

8   **16.     Preparation and Submittal of Stipulation and Proposed Order.** Within seven (7) days

9   of the expiration of the Agency Review Period, CSPA shall prepare a draft Stipulation and

10  Proposed Order for Defendant's review and approval.  Defendant shall have ten (10) days to

11  review and approve the draft Stipulation and Proposed Order and return it to CSPA for filing with

12  the Court.  The executed Stipulation and Proposed Order that the Parties shall file with the Court

13  under this paragraph shall provide:

14          A.      the Complaint and all claims therein are dismissed with prejudice pursuant to Federal

15  Rule of Civil Procedure 41(a)(2); and

16          B.      the Court agrees to retain jurisdiction solely for the purpose of resolving disputes

17  arising under this Agreement, as set forth herein; however, notwithstanding the previous

18  provisions of this sentence, Defendant's consent to the Court's retained jurisdiction as stated in

19  this Agreement does not constitute a waiver of either Defendant's sovereign immunity under the

20  Eleventh Amendment of the United States Constitution or the jurisprudential limitation on this

21  Court's remedial jurisdiction to prospective injunctive or declaratory relief.  Nothing in this

22  Agreement shall be construed as a waiver of any Party's right to appeal from an order that arises

23  from an action to enforce the terms of this Agreement.

24          **IV.    MISCELLANEOUS PROVISIONS**

25  **17.**    The Parties enter into this Agreement for the purpose of avoiding prolonged and costly

26  litigation.  Nothing in this Agreement shall be construed as an admission of any fact, finding or

27  conclusion of law by Defendant, and Defendant expressly denies any violation of law.

28

1   Compliance with this Agreement does not constitute an admission by Defendant of any fact,

2   finding, conclusion or issue of law, or violation of law.

3   **18.    Effective and Termination Dates of this Agreement.**  The Agreement shall be deemed

4   executed and shall be effective upon the date last signed by both Parties.  The Agreement shall

5   terminate on the "Termination Date," which shall be September 30, 2017.

6   **19.    Counterparts.**  The Agreement may be executed in one or more counterparts which, taken

7   together, shall be deemed to constitute one and the same document.  Signatures of the Parties

8   transmitted by facsimile or electronic mail transmission shall be deemed binding.  An executed

9   copy of this Agreement shall be valid as an original.

10   **20.**    The language in all parts of this Agreement, unless otherwise stated, shall be construed

11   according to its plain and ordinary meaning.  This Agreement shall be construed pursuant to

12   California law.

13   **21.**    The undersigned are authorized to execute this Agreement on behalf of their respective

14   Parties and have read, understood and agreed to be bound by all of the terms and conditions of

15   this Agreement.

16   **22.**    This Agreement and its attachments are made for the sole benefit of the Parties, and no

17   other person or entity shall have any rights or remedies under or by reason of this Agreement,

18   unless otherwise expressly provided for herein.

19   **23.    Notices.**  Any notices or documents required or provided for by this Agreement or related

20   thereto that are to be provided to the Parties pursuant to this Agreement shall be hand delivered or

21   sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by

22   electronic mail transmission to the email addresses listed below:

23   If to CSPA:

24

25          Bill Jennings, Executive Director
            California Sportfishing Protection Alliance
26          3536 Rainier Avenue
            Stockton, CA 95204
27          E-mail: DeltaKeep@me.com

28

[PROPOSED] CONSENT JUDGMENT                    Case No.  (2:13-CV-00840-GEB-DAD)

With copies sent to:

Andrew L. Packard
Law Offices of Andrew L. Packard
100 Petaluma Boulevard North, Suite 301
Petaluma, CA 94952
Tel:  (707) 763-7227
E-mail: Andrew@packardlawoffices.com

If to Defendant:

Ronald Rackley
Folsom State Prison
300 Prison Road
Represa, CA 95671
Tel:  (916) 985-2561
E-mail:  Ronald.Rackley@cdcr.ca.gov

Jeff Macomber
Califonia State Prisons-Sacramento
100 Prison Road
Represa, CA 95671
Tel:  (916) 985-8610
E-mail:  Jeff.Macomber@cdcr.ca.gov

With copies sent to:

Daniel S. Harris
Deputy Attorney General
California Department of Justice
Office of the Attorney General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, California 94612
Tel:  (510) 622-2125
Email:  Daniel.Harris@doj.ca.gov

Each Party shall promptly notify the other Party of any change in the above listed contact information.

**24.**    No Party shall be considered to be in default in the performance of any of its obligations when a failure to perform is due to a "Force Majeure."  A Force Majeure event is any

21

1   circumstances beyond the Party's control, including, without limitation, any act of God, war, fire,

2   earthquake, flood, and restraint by court order or public authority, and specifically includes,

3   without limitation, the absence of a sufficient number of Qualifying Storm Events in a given Wet

4   Season.  A Force Majeure event does not include a Party's inability to pay.  Any Party seeking to

5   rely upon this paragraph shall have the burden of establishing that it could not reasonably have

6   been expected to avoid, and which by exercise of due diligence has been unable to overcome, the

7   Force Majeure.

8   **25.**    If for any reason the Court should decline to approve, lodge and enter this Agreement in the

9   form presented, the Parties shall use their best efforts to work together to modify the Agreement

10   within thirty (30) days so that it is acceptable to the Court.  If the Parties are unable to modify this

11   Agreement in a mutually acceptable manner and to the Court's satisfaction, this Agreement shall

12   become null and void.

13   **26.**    This Agreement shall be deemed to have been drafted equally by the Parties, and shall not

14   be interpreted for or against either Party on the ground that any such party drafted it.

15   **27.**    This Agreement and the exhibits or attachments hereto contain all of the terms and

16   conditions agreed upon by the Parties relating to the matters covered by the Agreement, and

17   supersede any and all prior and contemporaneous agreements, covenants, representations,

18   warranties, negotiations, correspondence, understandings, and communications of the Parties,

19   whether oral or written, express or implied, respecting the matters covered by this Agreement.

20   This is an integrated agreement.

21   **28.    Amendment.**  This Agreement may be amended or modified only by a writing signed by

22   the Parties or their authorized representatives and approved by the Court.

23   **29.**    Except in case of an emergency but subject to the regulatory authority of any

24   applicable governmental authority, any material breach of or default under this Agreement

25   capable of being cured shall be deemed cured if, within ten (10) days of first receiving notice of

26   the alleged material breach or default, or within such other period approved in writing by the

27   Party making such allegation, which approval shall not be unreasonably withheld, the Party

28

1  allegedly in breach or default has completed such cure or, if the breach or default can be cured but

2  is not capable of being cured within such ten (10) day period, has commenced and is diligently

3  pursuing to completion such cure.

4       The Parties hereto enter into this Agreement and respectfully submit it to the Court for its

5  approval and entry.

6  Dated: _5Mar_, 2015                    California Sportfishing Protection Alliance

7

8

9                                         By: _Bill Jennings_

10                                        Bill Jennings, Executive Director

11

12 Dated: _____, 2015               Jeffrey Beard, in his official capacity as
                                          Secretary of the California Department of
13                                        Corrections and Rehabilitation

14

15

16                                        By:

17

18                                        _____
                                          Deborah Hysen
19                                        Director of Facility Planning,
                                          Construction and Management
20                                        California Department of Corrections and
                                          Rehabilitation

21

22

23

24
   SF2013404384
25

26

27

28

                                    23

[PROPOSED] CONSENT JUDGMENT              Case No. (2:13-CV-00840-GEB-DAD)

1   allegedly in breach or default has completed such cure or, if the breach or default can be cured but

2   is not capable of being cured within such ten (10) day period, has commenced and is diligently

3   pursuing to completion such cure.

4          The Parties hereto enter into this Agreement and respectfully submit it to the Court for its

5   approval and entry.

6   Dated: _____, 2015                    California Sportfishing Protection Alliance

7

8

9                                                 By: _____

10                                                Bill Jennings, Executive Director

11

12  Dated: *March 4*, 2015                        Jeffrey Beard, in his official capacity as
                                                  Secretary of the California Department of
13                                                Corrections and Rehabilitation

14

15

16                                                By: _____

17                                                _____

18                                                Deborah Hysen
                                                  Director of Facility Planning,
19                                                Construction and Management
                                                  California Department of Corrections and
20                                                Rehabilitation

21

22

23

24  SF2013404384

25

26

27

28

                                        23

[PROPOSED] CONSENT JUDGMENT                       Case No.  (2:13-CV-00840-GEB-DAD)

**EXHIBIT A**







Exhibit A-2   ----   PIA INDUSTRIAL AREA



Exhibit A-3  ----  LOWER YARD  --  (MAINTENANCE AREA & VOCATIONAL PROGRAMS)



Exhibit A-4   ----   GARAGE MAINTENANCE AREA

**EXHIBIT B**





EDMUND G. BROWN JR.
GOVERNOR

MATTHEW RODRIGUEZ
SECRETARY FOR
ENVIRONMENTAL PROTECTION

**Central Valley Regional Water Quality Control Board**

**APPROVED**

13 April 2012

*R̶?̶*/STAFF

/SENIOR

FILE COPY

Joe Franz
California Department of
Corrections Folsom
PO Box 71
Represa, CA  95671

**CERTIFIED MAIL**
**7011 2970 0003 5614 5539**

### WATER CODE SECTION 13267 ORDER FOR TECHNICAL REPORT FOR CALIFORNIA DEPARTMENT OF CORRECTIONS FOLSOM, SACRAMENTO COUNTY (WDID NO. 5S34I001227)

### YOU ARE LEGALLY OBLIGATED TO RESPOND TO THIS ORDER
### PLEASE READ THIS ORDER CAREFULLY

On 27 June 2011, Central Valley Water Board staff received your *2010-2011 Annual Report for Storm Water Discharges Associated with Industrial Activities*. Our review of analytical data provided in Form 1 of your Annual Report indicates that storm water runoff from your facility exceeded US EPA benchmark values as described below.

The Permit requires (a) that storm water discharges not cause or contribute to a violation of an applicable water quality standard, and (b) that facility operators reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges through the development and implementation of BMPs (best management practices) which constitutes compliance with BAT (best available technology economically achievable) and BCT (best conventional pollutant control technology). Benchmarks were developed to measure whether a facility was implementing BMPs in compliance with the Permit. Therefore, if benchmark exceedances are identified at your facility, the Permit requires you to submit a report identifying the pollutant source and describing the upgraded BMPs that will be implemented to reduce or eliminate the pollutant discharge.

Your facility is identified by Standard Industrial Classification (SIC) Code 3499-Fabricated Metal Products, NEC, 3711-Motor Vehicles and Passenger Car Bodies and 2759-Commercial Printing, NEC. The sampling parameters you are required to sample for are as follows:  Total suspended solids, specific conductance, pH, oil and grease or total organic carbon, iron, zinc, nitrate + nitrite as nitrogen, and aluminum.

The following table provides selected US EPA benchmark values and shows your sample results that the exceeded benchmark values as reported by your facility during the 2010/2011 reporting year.

| 2010-2011 Sampling Results | | USEPA Permit Benchmark Values or MCL |
|---|---|---|
| **Parameter, units** | **Sample Result** | |
| Total Suspended Solids, mg/L | 359 | 100 |
| Iron (total), mg/L | 3.43, 18.6, 2.37, 4.42, 2.29, 1.23 | 1.0 |
| Zinc (total), mg/L | 0.135, 0.129, 0.783, 0.155, 0.129, 0.526, 0.432, 0.127 | 0.117 |
| Nitrate + Nitrite as Nitrogen, mg/L | 2.5, 1.21, 1.25, 3.39, 1.07, 0.8, 2.21, 0.83 | 0.68 |
| Aluminum (total), mg/L | 2.75, 16.4, 1.82, 3.74, 2.43, 1.15 | 0.75 |

The levels of pollutants in your storm water samples indicate that the current BMPs implemented at your site are not sufficient to reduce pollutant concentrations below benchmark levels. While exceeding benchmark values is not a violation of the Permit, failure to respond to the exceedances by not reviewing BMP operation and improving BMPs is a violation of the Permit. Your Annual Report failed to address any review of, or changes to, BMPs at your facility regarding the above benchmark exceedance.

## Water Code Section 13267 Request for Technical Report

Section 13267 of the Water Code states, in part:

> In conducting an investigation specified in subdivision (a), the regional board may require that any person who has discharged, discharges, or is suspected of having discharged or discharging, or who proposes to discharge waste within its region, or any citizen or domiciliary, or political agency or entity of this state who has discharged, discharges, or is suspected of having discharged or discharging, or who proposes to discharge, waste outside of its region that could affect the quality of waters within its region shall furnish, under penalty of perjury, technical or monitoring program reports which the regional board requires. The burden, including costs, of these reports shall bear a reasonable relationship to the need for the report and the benefits to be obtained from the reports. In requiring those reports, the regional board shall provide the person with a written explanation with regard to the need for the reports, and shall identify the evidence that supports requiring that person to provide the reports.

California Department of Corrections Folsom is subject to the General Permit. The technical report required by this Order is needed by the Central Valley Water Board to ensure compliance with the General Permit.

Section 13268 of the Water Code states, in part:

> (a) Any person failing or refusing to furnish technical or monitoring program reports as required by subdivision (b) of Section 13267, or failing or refusing to furnish a statement of compliance as required by subdivision (b) of Section 13399.2, or falsifying and information provided therein, is guilty of a misdemeanor and may be liable civilly in accordance with subdivision (b).

*** 

> (b)(1) Civil liability may be administratively imposed by a regional board in accordance with Article 2.5 (commencing with section 13323) of Chapter 5 for a violation of subdivision (a) in an amount which shall not exceed one thousand dollars ($1,000) for each day in which the violation occurs.

California Department of Corrections Folsom        -3-                                    13 April 2012

Pursuant to the General Permit and Water Code section 13267, the Central Valley Water Board
requires you submit a technical report to this office by **14 May 2012** that addresses the following items:

1. Review previously submitted Annual Reports and identify the number of consecutive years that
   your facility has exceeded benchmark levels.

2. Identify sources of pollutants at your facility which contribute to the benchmark exceedances.

3. Review existing BMPs and BMP maintenance records.

4. Modify existing BMPs or implement new BMPs to reduce or eliminate the discharge of each of
   the pollutants listed above.

5. Submit an updated Storm Water Pollution Prevention Plan (SWPPP), SWPPP map, and
   Monitoring Plan to reflect improved BMP practices. Please note that a complete SWPPP and
   Monitoring Plan are required to be on site and available to operating personnel and inspectors.

6. Submit a report containing a description of the corrective measures that have been or will be
   implemented to address your facility's exceedances of the US EPA benchmark values. For the
   corrective measures that cannot be implemented by the due date above, provide a schedule for
   implementing these corrective measures with your response. All corrective measures must be
   implemented within 90 days of the date of this letter pursuant to General Permit Section A,
   Item 9.

Again, while exceeding benchmark values is not a violation of the Permit, failure to respond to the
exceedances by not reviewing BMP operation and continual improvement of BMPs is a violation of the
General Permit. Please be aware that under Water Code section 13385, the Water Board may impose
administrative civil liabilities of up to $10,000 a day for violations of the Permit. Under Water Code
section 13268, the Water Board may also impose administrative civil liabilities of up to $1,000 per day
for failure to comply with this Order for a technical report.

Please contact Robert Ditto at rditto@waterboards.ca.gov or (916) 464-4841 with any questions.


PAMELA C. CREEDON
Executive Officer

cc:  Eugene Bromley, U.S. Environmental Protection Agency, Region IX, San Francisco
     Cris Carrigan, Office of Enforcement, State Water Resource Control Board, Sacramento

**EXHIBIT C**

**EXHIBIT C**

| Parameter | EPA Parameter Benchmark Value or Numeric Action Level for 2014/2015 Wet Season (or July 2015 to June 2016 Time Period) | Test Method for 2014-2015 Wet Season | Test Method for July 2015-2016 Wet Season |
|---|---|---|---|
| pH | 6.0-9.0 | pH strips (wide range litmus pH paper) or a pH meter (calibrated portable instrument for pH) | pH strips (wide range litmus pH paper) or a pH meter (calibrated portable instrument for pH) |
| Specific Conductance | 200 µmhos/cm | EPA 120.1/SM 2510-B | N/A |
| Oil & Grease | 15 mg/L | EPA 1664 | EPA 1664A |
| Total Suspended Solids | 100 mg/L | SM 2540-D | SM 2540-D |
| Iron (total) | 1.0 mg/L | EPA 200.7 | EPA 200.7 |
| Copper | 0.0636 mg/L (0.0332 mg/L for 2015-2016 Wet Season) | EPA 200.7 | EPA 200.8 |
| Lead | 0.0816 mg/L (0.262 mg/L for 2015-2016 Wet Season) | EPA 200.7 | EPA 200.8 |
| Zinc (total) | 0.117 mg/L (0.26 mg/L for 2015-2016 Wet Season) | EPA 200.8 | EPA 200.8 |
| Nitrate + Nitrite as Nitrogen | 0.68 mg/L | SM 4500-NO3-E | SM 4500-NO3-E |
| Aluminum (total) | 0.75 mg/L | EPA 200.8 | EPA 200.8 |

**EXHIBIT D**



February 8, 2013

VIA CERTIFIED MAIL
<u>RETURN RECEIPT REQUESTED</u>

Joseph Franz, Senior Hazardous Material Specialist and Facility Contact
Nancy Spong, Facility Operator Contact
California Department of Corrections & Rehabilitation – Folsom State Prison
100 Prison Road #300
Represa, CA 95671

Nancy Spong, Facility Operator Contact
California Department of Corrections & Rehabilitation – Folsom State Prison
300 Prison Road
Represa, CA 95671

Michael E. Knowles, Facility Operator Contact
Joseph Franz, Senior Hazardous Material Specialist and Facility Contact
California Department of Corrections & Rehabilitation – Folsom State Prison
P.O. Box 71
Represa, CA 95671

Jeffrey Beard, Secretary of California Department of Corrections & Rehabilitation
Office of Legal Affairs, Agent for Service of Process
1515 S St., Ste. 314 South
Sacramento, CA 95811

**Re:    Notice of Violations and Intent to File Suit Under the Federal Water
      Pollution Control Act**

Dear Messrs. Franz, Beard, Knowles and Ms. Spong:

I am writing on behalf of the California Sportfishing Protection Alliance
("CSPA") in regard to violations of the Clean Water Act ("the Act") occurring at the
California Department of Corrections & Rehabilitation, Folsom State Prison ("Folsom")
facility, located at 100 Prison Road #300 in Represa, California ("the Facility").  The

Notice of Violation and Intent To File Suit
February 8, 2013
Page 2 of 24

WDID identification number for the Facility is 5S34I001227.  CSPA is a non-profit public benefit corporation dedicated to the preservation, protection and defense of the environment, wildlife and natural resources of the American River, the Sacramento River, the Sacramento-San Joaquin River Delta and other California waters and the Pacific Ocean.  This letter is being sent to you as the responsible owner, officer, or operator of the Facility.  Unless otherwise noted, the California Department of Corrections & Rehabilitation, Joseph Franz, Jeffrey Beard, Michael E. Knowles and Nancy Spong shall hereinafter be collectively referred to as Folsom.

This letter addresses Folsom's unlawful discharges of pollutants from the Facility to the American River, which flows into the Sacramento River and the Sacramento-San Joaquin Delta.  This letter addresses the ongoing violations of the substantive and procedural requirements of the Clean Water Act and National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Order No. 97-03-DWQ ("General Permit" or "General Industrial Storm Water Permit").

Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen must give notice of intent to file suit.  Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("the EPA"), and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility.  Consequently, California Department of Corrections & Rehabilitation, Joseph Franz, Jeffrey Beard, Michael E. Knowles and Nancy Spong are hereby placed on formal notice by CSPA that, after the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, CSPA intends to file suit in federal court against California Department of Corrections & Rehabilitation, Joseph Franz, Jeffrey Beard, Michael E. Knowles and Nancy Spong under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the General Permit.  These violations are described more fully below.

I.      **Background.**

Folsom owns and operates a prison facility located in Represa, California.  The Facility falls under Standard Industrial Classification ("SIC") Code 3499 ("Fabricated Metal Products, Not Elsewhere Classified"), 3711 ("Motor Vehicles and Passenger Car Bodies") and 2759 ("Commercial Printing, Not Elsewhere Classified").  The sampling parameters Folsom is required to sample for are as follows: Total Suspended Solids, Specific Conductance, pH, Oil & Grease or Total Organic Carbon, Iron, Zinc, Nitrate + Nitrite as Nitrogen, and Aluminum.  The Facility is primarily used to house California State Prison inmates.  It includes areas devoted to fabricated metal parts, vehicle maintenance, and commercial printing, activities which require the Facility to handle,

Case 2:13-cv-00840-GEB-DAD   Document 21   Filed 05/01/15   Page 44 of 72
Notice of Violation and Intent To File Suit
February 8, 2013
Page 3 of 24

store, manufacture and transport manufactured metal, vehicle, and printing parts and related materials. Other activities at the Facility include the use and storage of heavy machinery and motorized vehicles, including trucks used to haul materials to, from and within the Facility.

Folsom discharges storm water from its approximately 1200-acre Facility through at least one (7) discharge points into the American River, which flows into the Sacramento River and the Sacramento-San Joaquin Delta. The Delta and its tributaries are waters of the United States within the meaning of the Clean Water Act.

The Central Valley Regional Water Quality Control Board ("Regional Board" or "Board") has established water quality standards for the American River, Sacramento River and the Delta in the "Water Quality Control Plan for the Sacramento River and San Joaquin River Basins," generally referred to as the Basin Plan. The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life." For the Delta, the Basin Plan establishes standards for several metals, including (at a hardness of 40 mg/L): arsenic – 0.01 mg/L; copper – 0.01 mg/L; iron – 0.3 mg/L; and zinc – 0.1 mg/L. *Id*. at III-3.00, Table III-1. The Basin Plan states that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain lead in excess of 0.015 mg/L." *Id*. at III-3.00. The Basin Plan also provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5." *Id*. at III-6.00. The Basin Plan also prohibits the discharges of oil and grease, stating that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses." *Id*. at III-5.00.

The Basin Plan also provides that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs)." *Id*. at III-3.0. The EPA has issued a recommended water quality criterion for aluminum for freshwater aquatic life protection of 0.087 mg/L. EPA has established a secondary MCL, consumer acceptance limit for aluminum of 0.05 mg/L to 0.2 mg/L. EPA has established a secondary MCL, consumer acceptance limit for zinc of 5.0 mg/L. EPA has established a primary MCL, consumer acceptance limit for the following: chromium – 0.1 mg/L; copper – 1.3 mg/L; and lead – 0.0 (zero) mg/L. *See* http://www.epa.gov/safewater/ mcl.html. The California Department of Health Services has also established the following MCL, consumer acceptance levels: aluminum – 1 mg/L (primary) and 0.2 mg/L (secondary); chromium – 0.5 mg/L (primary); copper – 1.0 mg/L (secondary); iron – 0.3 mg/L; and zinc – 5.0 mg/L. *See* California Code of Regulations, title 22, §§ 64431, 64449.

EPA has also issued numeric receiving water limits for certain toxic pollutants in California surface waters, commonly known as the California Toxics Rule ("CTR"). 40 CFR § 131.38. The CTR establishes the following numeric limits for freshwater surface

Case 2:13-cv-00840-GEB-DAD   Document 21   Filed 05/01/15   Page 45 of 72
Notice of Violation and Intent To File Suit
February 8, 2013
Page 4 of 24

waters:  arsenic – 0.34 mg/L (maximum concentration) and 0.150 mg/L (continuous concentration); chromium (III) – 0.550 mg/L (maximum concentration) and 0.180 mg/L (continuous concentration); copper – 0.013 mg/L (maximum concentration) and 0.009 mg/L (continuous concentration); lead – 0.065 mg/L (maximum concentration) and 0.0025 mg/L (continuous concentration).

The Regional Board has also identified waters of the Delta as failing to meet water quality standards for unknown toxicity, electrical conductivity, numerous pesticides and mercury.  *See* http://www.swrcb.ca.gov/tmdl/docs/2002reg5303dlist.pdf. Discharges of listed pollutants into an impaired surface water may be deemed a "contribution" to the exceedance of CTR, a water quality standard, and may indicate a failure on the part of a discharger to implement adequate storm water pollution control measures.  *See Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 375 F.3d 913, 918 (9th Cir. 2004); *see also Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 2005 WL 2001037 at *3, 5 (E.D. Cal., Aug. 19, 2005) (finding that a discharger covered by the General Industrial Storm Water Permit was "subject to effluent limitation as to certain pollutants, including zinc, lead, copper, aluminum and lead" under the CTR).

The General Permit incorporates benchmark levels established by EPA as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT").  The following benchmarks have been established for pollutants likely discharged by Folsom: aluminum – 0.75 mg/L; pH— 6.0 – 9.0; iron – 1.0 mg/L; copper – 0.0636 mg/L; lead – 0.0816 mg/L; beryllium 0.13 mg/L;  total suspended solids – 100.0 mg/L; nitrate + nitrite 0.68 mg/L; and zinc – 0.117 mg/L.  The State Water Quality Control Board has also proposed adding a benchmark level for specific conductance, 200 μmhos/cm.  Additional EPA benchmark levels have been established for other parameters that CSPA believes are being discharged from the Facility, including but not limited to, magnesium – 0.0636 mg/L and manganese – 1.0 mg/L.

## II.    Folsom Is Violating the Act by Discharging Pollutants From the Facility to Waters of the United States.

Under the Act, it is unlawful to discharge pollutants from a "point source" to navigable waters without obtaining and complying with a permit governing the quantity and quality of discharges.  *Trustees for Alaska v. EPA*, 749 F.2d 549, 553 (9th Cir. 1984). Section 301(a) of the Clean Water Act prohibits "the discharge of any pollutants by any person . . ." except as in compliance with, among other sections of the Act, Section 402, the NPDES permitting requirements.  33 U.S.C. § 1311(a).  The duty to apply for a permit extends to "[a]ny person who discharges or proposes to discharge pollutants. . . ." 40 C.F.R. § 122.30(a).

The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  Pollutants are defined

Notice of Violation and Intent To File Suit
February 8, 2013
Page 5 of 24

to include, among other examples, a variety of metals, chemical wastes, biological materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).  A point source is defined as "any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).  An industrial facility that discharges pollutants into a navigable water is subject to regulation as a "point source" under the Clean Water Act.  *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993).  "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7).  Navigable waters under the Act include man-made waterbodies and any tributaries or waters adjacent to other waters of the United States.  *See Headwaters, Inc. v Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001).

The American River, Sacramento River and its tributaries and the Pacific Ocean are waters of the United States.  Accordingly, Folsom's discharges of storm water containing pollutants from the Facility are discharges to waters of the United States.

CSPA is informed and believes, and thereupon alleges, that Folsom has discharged and is discharging pollutants from the Facility to waters of the United States every day that there has been or will be any measurable flow of water from the Facility since February 8, 2008.  Each discharge on each separate day is a separate violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These unlawful discharges are ongoing. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Folsom is subject to penalties for violations of the Act since February 8, 2008.

## III.     Pollutant Discharges in Violation of the NPDES Permit.

Folsom has violated and continues to violate the terms and conditions of the General Permit.  Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit such as the General Permit.  33 U.S.C. § 1342.  The General Permit prohibits any discharges of storm water associated with industrial activities that have not been subjected to BAT or BCT.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8). Conventional pollutants are TSS, Oil & Grease ("O&G"), pH, biochemical oxygen demand ("BOD"), and fecal coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  *Id.*; 40 C.F.R. § 401.15.

Further, Discharge Prohibition A(1) of the General Permit provides:  "Except as allowed in Special Conditions (D.1.) of this General Permit, materials other than storm water (non-storm water discharges) that discharge either directly or indirectly to waters of the United States are prohibited.  Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit."  Special Conditions D(1) of the

Notice of Violation and Intent To File Suit
February 8, 2013
Page 6 of 24

General Permit sets forth the conditions that must be met for any discharge of non-storm water to constitute an authorized non-storm water discharge.

Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

As recently as April 13, 2012, the Regional Water Quality Control Board, Region 5, sent Folsom an 13267 Order ("the 13267 Order") conveying its conclusion that, among other things, Folsom's 2010-2011 Annual Report contained evidence that the BMPs then in effect were not sufficient to reduce pollutant concentrations below EPA benchmark levels.  The 13267 Order informed Folsom that its 2010-2011 Annual Report indicated storm water samples in excess of US EPA benchmark values for certain parameters. Based on this evidence, the Board ordered Folsom to: (1) Review previously submitted Annual Reports and identify the number of consecutive years that the Facility has exceeded benchmark levels; (2) Identify sources of pollutants at the Facility that contributed to the exceedances; (3) Review current BMPs; (4) Modify existing BMPs or implement additional BMPs to reduce or eliminate discharge of pollutants; and (5) modify the SWPPP and Monitoring Plan for the Facility and maintain a copy of these required documents at the Facility.  Finally, the Board ordered Folsom to respond to these concerns by providing the Board a written response by no later than May 14, 2012.

Based on its review of available public documents, CSPA is informed and believes: (1) that Folsom continues to discharge pollutants in excess of benchmarks, (2) that Folsom continues to fail to sample for parameters required by the General Permit, and (3) that Folsom has failed to implement BMPs adequate to bring its discharge of these and other pollutants in compliance with the General Permit.  Folsom's ongoing violations are discussed further below.

**A.     Folsom Has Discharged Storm Water Containing Pollutants in Violation of the Permit.**

Folsom has discharged and continues to discharge storm water with unacceptable levels of Aluminum (Al), Iron (Fe), Zinc (Zn), Nitrate + Nitrite Nitrogen (N+N), pH, Copper (Cu), Beryllium (Be), Total Suspended Solids (TSS), Specific Conductance (SC) in violation of the General Permit.  These high pollutant levels have been documented during significant rain events, including the rain events indicated in the table of rain data attached hereto as Attachment A.  Folsom's Annual Reports and Sampling and Analysis Results confirm discharges of materials other than storm water and specific pollutants in violation of the Permit provisions listed above.  Self-monitoring reports under the Permit

Notice of Violation and Intent To File Suit
February 8, 2013
Page 7 of 24

are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit:

**1.**  **Discharge of Storm Water Containing Aluminum (Al) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|------|-----------------|-----------|----------------------------|-----------------|
| 3/13/2012 | A2 | Al | 2.64 mg/L | 0.75 mg/L |
| 3/13/2012 | C1 | Al | 4.28 mg/L | 0.75 mg/L |
| 3/13/2012 | C3 | Al | 6.63 mg/L | 0.75 mg/L |
| 3/13/2012 | D | Al | 1.56 mg/L | 0.75 mg/L |
| 3/6/2012 | A1 | Al | 1.2 mg/L | 0.75 mg/L |
| 3/6/2012 | A2 | Al | 0.777 mg/L | 0.75 mg/L |
| 3/6/2012 | C1 | Al | 3.0 mg/L | 0.75 mg/L |
| 3/6/2012 | C3 | Al | 8.93 mg/L | 0.75 mg/L |
| 2/14/2011 | A1 | Al | 2.29 mg/L | 0.75 mg/L |
| 2/14/2011 | C3 | Al | 1.15 mg/L | 0.75 mg/L |
| 1/13/2011 | A1 | Al | 2.75 mg/L | 0.75 mg/L |
| 1/13/2011 | B | Al | 16.4 mg/L | 0.75 mg/L |
| 1/13/2011 | C3 | Al | 3.74 mg/L | 0.75 mg/L |
| 1/13/2011 | D | Al | 1.82 mg/L | 0.75 mg/L |
| 11/20/2009 | A2 | Al | 1.7 mg/L | 0.75 mg/L |

Notice of Violation and Intent To File Suit
February 8, 2013
Page 8 of 24

| 11/20/2009 | C1 | Al | 1.0 mg/L | 0.75 mg/L |
| 11/20/2009 | C3 | Al | 0.8 mg/L | 0.75 mg/L |
| 10/19/2009 | A2 | Al | 2.2 mg/L | 0.75 mg/L |
| 10/19/2009 | C1 | Al | 2.0 mg/L | 0.75 mg/L |
| 10/19/2009 | C3 | Al | 1.1 mg/L | 0.75 mg/L |

**2.      Discharge of Storm Water Containing Iron (Fe) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 3/13/2012 | A2 | Fe | 2.73 mg/L | 1.0 mg/L |
| 3/13/2012 | C1 | Fe | 4.63 mg/L | 1.0 mg/L |
| 3/13/2012 | C3 | Fe | 6.15 mg/L | 1.0 mg/L |
| 3/13/2012 | D | Fe | 1.41 mg/L | 1.0 mg/L |
| 3/6/2012 | A1 | Fe | 1.14 mg/L | 1.0 mg/L |
| 3/6/2012 | A2 | Fe | 1.02 mg/L | 1.0 mg/L |
| 3/6/2012 | C1 | Fe | 3.58 mg/L | 1.0 mg/L |
| 3/6/2012 | C3 | Fe | 8.86 mg/L | 1.0 mg/L |
| 2/14/2011 | A1 | Fe | 2.43 mg/L | 1.0 mg/L |
| 2/14/2011 | C3 | Fe | 1.23 mg/L | 1.0 mg/L |
| 1/13/2011 | A1 | Fe | 3.43 mg/L | 1.0 mg/L |
| 1/13/2011 | B | Fe | 18.6 mg/L | 1.0 mg/L |

Notice of Violation and Intent To File Suit
February 8, 2013
Page 9 of 24

| 1/13/2011 | C3 | Fe | 4.42 mg/L | 1.0 mg/L |
| 1/13/2011 | D | Fe | 2.37 mg/L | 1.0 mg/L |
| 11/20/2009 | A2 | Fe | 2.3 mg/L | 1.0 mg/L |
| 11/20/2009 | C1 | Fe | 2.7 mg/L | 1.0 mg/L |
| 11/20/2009 | C3 | Fe | 1.1 mg/L | 1.0 mg/L |
| 10/19/2009 | A2 | Fe | 2.8 mg/L | 1.0 mg/L |
| 10/19/2009 | C1 | Fe | 5.5 mg/L | 1.0 mg/L |
| 10/19/2009 | C3 | Fe | 1.8 mg/L | 1.0 mg/L |

3.      **Discharge of Storm Water Containing Zinc (Zn) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 3/13/2012 | A2 | Zn | 0.603 mg/L | 0.117 mg/L |
| 3/13/2012 | B | Zn | 0.155 mg/L | 0.117 mg/L |
| 3/13/2012 | C1 | Zn | 0.304 mg/L | 0.117 mg/L |
| 3/13/2012 | C3 | Zn | 0.35 mg/L | 0.117 mg/L |
| 3/6/2012 | A2 | Zn | 0.297 mg/L | 0.117 mg/L |
| 3/6/2012 | C1 | Zn | 0.267 mg/L | 0.117 mg/L |
| 3/6/2012 | C3 | Zn | 0.325 mg/L | 0.117 mg/L |
| 2/14/2011 | A2 | Zn | 0.526 mg/L | 0.117 mg/L |
| 2/14/2011 | B | Zn | 0.118 mg/L | 0.117 mg/L |

Notice of Violation and Intent To File Suit
February 8, 2013
Page 10 of 24

| | | | | |
|---|---|---|---|---|
| 2/14/2011 | C1 | Zn | 0.432 mg/L | 0.117 mg/L |
| 1/13/2011 | A1 | Zn | 0.135 mg/L | 0.117 mg/L |
| 1/13/2011 | A2 | Zn | 0.129 mg/L | 0.117 mg/L |
| 1/13/2011 | B | Zn | 0.783 mg/L | 0.117 mg/L |
| 1/13/2011 | C1 | Zn | 0.155 mg/L | 0.117 mg/L |
| 1/13/2011 | C3 | Zn | 0.129 mg/L | 0.117 mg/L |
| 11/20/2009 | A2 | Zn | 0.45 mg/L | 0.117 mg/L |
| 11/20/2009 | B | Zn | 0.15 mg/L | 0.117 mg/L |
| 11/20/2009 | C1 | Zn | 0.20 mg/L | 0.117 mg/L |
| 10/19/2009 | A2 | Zn | 0.76 mg/L | 0.117 mg/L |
| 10/19/2009 | C1 | Zn | 0.45 mg/L | 0.117 mg/L |
| 10/19/2009 | C3 | Zn | 0.19 mg/L | 0.117 mg/L |
| 4/24/2009 | A2 | Zn | 3.1 mg/L | 0.117 mg/L |
| 4/24/2009 | C1 | Zn | 0.13 mg/L | 0.117 mg/L |

4.     **Discharge of Storm Water Containing Nitrate + Nitrite Nitrogen (N+N) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 3/13/2012 | A1 | N+N | 3.85 mg/L | 0.68 mg/L |
| 3/13/2012 | B | N+N | 2.0 mg/L | 0.68 mg/L |

Notice of Violation and Intent To File Suit
February 8, 2013
Page 11 of 24

| 3/13/2012 | C1 | N+N | 1.43 mg/L | 0.68 mg/L |
| 3/13/2012 | C3 | N+N | 1.46 mg/L | 0.68 mg/L |
| 3/13/2012 | D | N+N | 4.63 mg/L | 0.68 mg/L |
| 3/6/2012 | A1 | N+N | 3.11 mg/L | 0.68 mg/L |
| 3/6/2012 | B | N+N | 1.71 mg/L | 0.68 mg/L |
| 3/6/2012 | C1 | N+N | 0.81 mg/L | 0.68 mg/L |
| 3/6/2012 | C3 | N+N | 1.21 mg/L | 0.68 mg/L |
| 3/6/2012 | D | N+N | 4.0 mg/L | 0.68 mg/L |
| 2/14/2011 | A1 | N+N | 3.39 mg/L | 0.68 mg/L |
| 2/14/2011 | B | N+N | 1.07 mg/L | 0.68 mg/L |
| 2/14/2011 | C1 | N+N | 0.8 mg/L | 0.68 mg/L |
| 2/14/2011 | C3 | N+N | 0.83 mg/L | 0.68 mg/L |
| 2/14/2011 | D | N+N | 2.21 mg/L | 0.68 mg/L |
| 1/13/2011 | A1 | N+N | 2.5 mg/L | 0.68 mg/L |
| 1/13/2011 | B | N+N | 1.21 mg/L | 0.68 mg/L |
| 1/13/2011 | D | N+N | 1.25 mg/L | 0.68 mg/L |
| 11/20/2009 | A1 | N+N | 2.0 mg/L | 0.68 mg/L |
| 11/20/2009 | A2 | N+N | 1.3 mg/L | 0.68 mg/L |
| 11/20/2009 | B | N+N | 0.71 mg/L | 0.68 mg/L |
| 11/20/2009 | C1 | N+N | 1.4 mg/L | 0.68 mg/L |

Notice of Violation and Intent To File Suit
February 8, 2013
Page 12 of 24

| 11/20/2009 | D | N+N | 5.3 mg/L | 0.68 mg/L |
| 10/19/2009 | A1 | N+N | 1.9 mg/L | 0.68 mg/L |
| 10/19/2009 | A2 | N+N | 1.4 mg/L | 0.68 mg/L |
| 10/19/2009 | B | N+N | 0.77 mg/L | 0.68 mg/L |
| 10/19/2009 | C1 | N+N | 1.8 mg/L | 0.68 mg/L |
| 10/19/2009 | D | N+N | 4.4 mg/L | 0.68 mg/L |
| 10/19/2009 | C3 | N+N | 2.1 mg/L | 0.68 mg/L |
| 4/24/2009 | A1 | N+N | 3.6 mg/L | 0.68 mg/L |
| 4/24/2009 | A2 | N+N | 3.9 mg/L | 0.68 mg/L |
| 4/24/2009 | C1 | N+N | 1.9 mg/L | 0.68 mg/L |
| 4/24/2009 | D | N+N | 6.2 mg/L | 0.68 mg/L |
| 2/5/2009 | A1 | N+N | 2.7 mg/L | 0.68 mg/L |
| 2/5/2009 | A2 | N+N | 4.4 mg/L | 0.68 mg/L |
| 2/5/2009 | D | N+N | 6.4 mg/L | 0.68 mg/L |

5.    **Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 3/13/2012 | C3 | TSS | 126 mg/L | 100 mg/L |
| 3/6/2012 | C3 | TSS | 221 mg/L | 100 mg/L |

Notice of Violation and Intent To File Suit
February 8, 2013
Page 13 of 24

| 1/13/2011 | B | TSS | 359 mg/L | 100 mg/L |
|---|---|---|---|---|

6. **Discharge of Storm Water Containing pH at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 4/24/2009 | A2 | pH | 5.58 s.u. | 6.0 – 9.0 s.u. |

7. **Discharge of Storm Water Containing Copper (Cu) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 1/13/2011 | B | Cu | 0.179 mg/L | 0.0636 mg/L |
| 10/19/2009 | A2 | Cu | 0.079 mg/L | 0.0636 mg/L |
| 10/19/2009 | C1 | Cu | 0.065 mg/L | 0.0636 mg/L |
| 4/24/2009 | A2 | Cu | 0.18 mg/L | 0.0636 mg/L |
| 4/24/2009 | C1 | Cu | 0.13 mg/L | 0.0636 mg/L |

8. **Discharge of Storm Water Containing Beryllium (Be) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 4/24/2009 | D | Be | 0.14 mg/L | 0.13 mg/L |

Notice of Violation and Intent To File Suit
February 8, 2013
Page 14 of 24

9.      **Discharge of Storm Water Containing Specific Conductance (SC) at Concentration in Excess of Proposed EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Proposed Benchmark Value |
|---|---|---|---|---|
| 3/13/2012 | A1 | SC | 345 mg/L | 200 mg/L |
| 3/13/2012 | B | SC | 228 mg/L | 200 mg/L |
| 3/13/2012 | D | SC | 380 mg/L | 200 mg/L |
| 3/6/2012 | A1 | SC | 300 mg/L | 200 mg/L |
| 3/6/2012 | B | SC | 206 mg/L | 200 mg/L |
| 3/6/2012 | C1 | SC | 244 mg/L | 200 mg/L |
| 3/6/2012 | D | SC | 405 mg/L | 200 mg/L |
| 2/14/2011 | A1 | SC | 284 mg/L | 200 mg/L |
| 2/14/2011 | B | SC | 261 mg/L | 200 mg/L |
| 2/14/2011 | D | SC | 226 mg/L | 200 mg/L |
| 1/13/2011 | B | SC | 242 mg/L | 200 mg/L |
| 1/13/2011 | D | SC | 405 mg/L | 200 mg/L |
| 11/20/2009 | A1 | SC | 220 mg/L | 200 mg/L |
| 11/20/2009 | B | SC | 360 mg/L | 200 mg/L |
| 11/20/2009 | D | SC | 370 mg/L | 200 mg/L |
| 10/19/2009 | A1 | SC | 320 mg/L | 200 mg/L |
| 10/19/2009 | B | SC | 290 mg/L | 200 mg/L |

Case 2:13-cv-00840-GEB-DAD   Document 21   Filed 05/01/15   Page 56 of 72
Notice of Violation and Intent To File Suit
February 8, 2013
Page 15 of 24

| 10/19/2009 | C1 | SC | 440 mg/L | 200 mg/L |
| 10/19/2009 | D | SC | 400 mg/L | 200 mg/L |
| 4/24/2009 | A1 | SC | 310 mg/L | 200 mg/L |
| 4/24/2009 | A2 | SC | 840 mg/L | 200 mg/L |
| 4/24/2009 | B | SC | 290 mg/L | 200 mg/L |
| 4/24/2009 | C1 | SC | 310 mg/L | 200 mg/L |
| 4/24/2009 | D | SC | 450 mg/L | 200 mg/L |
| 2/5/2009 | A1 | SC | 260 mg/L | 200 mg/L |
| 2/5/2009 | A2 | SC | 320 mg/L | 200 mg/L |
| 2/5/2009 | B | SC | 310 mg/L | 200 mg/L |
| 2/5/2009 | C1 | SC | 320 mg/L | 200 mg/L |
| 2/5/2009 | C3 | SC | 400 mg/L | 200 mg/L |

CSPA's investigation, including its review of Folsom's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of EPA's benchmark value for Aluminum (Al), Iron (Fe), Zinc (Zn), Nitrate + Nitrite Nitrogen (N+N), pH, Copper (Cu), Beryllium (Be) and Total Suspended Solids (TSS) and the proposed benchmark value for Specific Conductance (SC) indicates that Folsom has not implemented BAT and BCT at the Facility for its discharges of Aluminum (Al), Iron (Fe), Zinc (Zn), Nitrate + Nitrite Nitrogen (N+N), pH, Copper (Cu), Beryllium (Be), Total Suspended Solids (TSS), Specific Conductance (SC) and other pollutants, in violation of Effluent Limitation B(3) of the General Permit. Folsom was required to have implemented BAT and BCT by no later than October 1, 1992 or the start of its operations. Thus, Folsom is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

CSPA is informed and believes that Folsom has known that its storm water contains pollutants at levels exceeding EPA Benchmarks and other water quality criteria since at least February 8, 2008. CSPA alleges that such violations also have occurred and

Case 2:13-cv-00840-GEB-DAD   Document 21   Filed 05/01/15   Page 57 of 72
Notice of Violation and Intent To File Suit
February 8, 2013
Page 16 of 24

will occur on other rain dates, including during every single significant rain event that has
occurred since February 8, 2008, and that will occur at the Facility subsequent to the date
of this Notice of Violation and Intent to File Suit.  Attachment A, attached hereto, sets
forth each of the specific rain dates on which CSPA alleges that Folsom has discharged
storm water containing impermissible levels of Aluminum (Al), Iron (Fe), Zinc (Zn),
Nitrate + Nitrite (N+N), pH, Copper (Cu), Beryllium (Be), Total Suspended Solids
(TSS), Specific Conductance (SC) and other unmonitored pollutants in violation of
Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of
the General Permit.

These unlawful discharges from the Facility are ongoing.  Each discharge of
storm water containing any pollutants from the Facility without the implementation of
BAT/BCT constitutes a separate violation of the General Permit and the Act.  Consistent
with the five-year statute of limitations applicable to citizen enforcement actions brought
pursuant to the federal Clean Water Act, Folsom is subject to penalties for violations of
the General Permit and the Act since February 8, 2008.

> **B.    Folsom Has Failed to Implement an Adequate Monitoring &
> Reporting Plan.**

Section B of the General Industrial Storm Water Permit requires that dischargers
develop and implement an adequate Monitoring and Reporting Plan by no later than
October 1, 1992 or the start of operations.  Sections B(3), B(4) and B(7) require that
dischargers conduct regularly scheduled visual observations of non-storm water and
storm water discharges from the Facility and to record and report such observations to the
Regional Board.  Section B(5)(a) of the General Permit requires that dischargers "shall
collect storm water samples during the first hour of discharge from (1) the first storm
event of the wet season, and (2) at least one other storm event in the wet season.  All
storm water discharge locations shall be sampled."  Section B(5)(c)(i) further requires
that the samples shall be analyzed for total suspended solids, pH, specific conductance,
and total organic carbon.  Oil and grease may be substituted for total organic carbon.
Section B(5)(c)(ii) of the General Permit further requires dischargers to analyze samples
for all "[t]oxic chemicals and other pollutants that are likely to be present in storm water
discharges in significant quantities."  Section B(10) of the General Permit provides that
"facility operators shall explain how the facility's monitoring program will satisfy the
monitoring program objectives of [General Permit] Section B.2."

Based on its investigation, CSPA is informed and believes that Folsom has failed
to develop and implement an adequate Monitoring & Reporting Plan.  First, based on its
review of publicly available documents, CSPA is informed and believes that Folsom has
failed to collect storm water samples during at least two qualifying storms events, as
defined by the General Permit, during the past five Wet Seasons.  Second, based on its
review of publicly available documents, CSPA is informed and believes that Folsom has
failed to conduct the monthly visual monitoring of storm water discharges and the
quarterly visual observations of unauthorized non-storm water discharges required under

Notice of Violation and Intent To File Suit
February 8, 2013
Page 17 of 24

the General Permit during the past five Wet Seasons.  Third, based on its review of
publicly available documents, CSPA is informed and believes that Folsom has failed to
collect storm water samples from the first storm of the Wet Season that produced a
discharge during scheduled Facility operating hours during the past five years.  Each of
these failures constitutes a separate and ongoing violation of the General Permit and the
Act.  Consistent with the five-year statute of limitations applicable to citizen enforcement
actions brought pursuant to the federal Clean Water Act, Folsom is subject to penalties
for violations of the General Industrial Storm Water Permit and the Act since February 8,
2008.  These violations are set forth in greater detail below:

    **1.   Folsom Has Failed to Collect Storm Water Samples During at Least Two
        Qualifying Rain Events In Each of the Last Five Years.**

       Section B(5) of the General Industrial Storm Water Permit requires facility
operators to collect storm water samples from "[a]ll storm water discharge locations"
during at least two qualifying storm events each wet season.  General Permit § B(5)(a).
Based on its review of publicly available documents, CSPA is informed and believes that
Folsom has failed to collect storm water samples during at least two qualifying rain
events at the Facility during each of the past five years, as required by the General
Permit.  For example, CSPA notes that Folsom reported in its 2009-2010 Annual Report
that it collected storm water discharge samples from two qualifying storm events when in
fact it only collected storm water discharge from one qualifying storm event.  This failure
to adequately monitor storm water discharges constitutes separate and ongoing violations
of the General Permit and the Act.

       Further, it is likely that Folsom did not sample the first storm of the season during
most of the last five Wet Seasons.  For example, Folsom's first sample from the 2011-
2012 Wet Season is from March 6, 2012.  Based upon its review of publicly available
rainfall data, CSPA is informed and believes that the first storm of the 2011-2012 Wet
Season occurred as early as Tuesday, October 4, 2011, when 0.2" of rain fell on the
Facility.

       Folsom's failure to conduct this required sampling extends back to at least
February 8, 2008.  Folsom's failure to conduct this required sampling has caused and
continues to cause multiple, separate and ongoing violations of the General Permit and
the Act.

      **2.      Folsom Has Failed to Conduct the Monthly Wet Season
            Observations of Storm Water Discharges Required by the
            General Permit.**

       The General Permit requires dischargers to "visually observe storm water
discharges from one storm event per month during the wet season (October 1 – May 30)."
General Permit, Section B(4)(a).  The General Permit requires that the annual reports
filed by Folsom at the Regional Board document these required visual observations on

Notice of Violation and Intent To File Suit
February 8, 2013
Page 18 of 24

Form 4 Monthly Visual Inspections.  Based upon its review of publicly available historical precipitation records for the Represa area, CSPA is informed and believes that Folsom failed to conduct the required monthly visual monitoring of storm water discharges because on many of the dates that Folsom reported having observed storm water discharges, local precipitation records indicate that the storm was not a qualifying storm event.  General Permit Section B(4)(b) provides that monthly visual observations of qualifying storm events are "required of storm water discharges that occur during daylight hours that are preceded by at least three (3) working days without storm water discharges and that occur during scheduled operating hours."  Many of the dates that Folsom reported having conducted monthly visual observations of storm water discharges are invalid because such observations occurred during storm events that were *not* preceded by at least three days without storm water discharging from the Facility.

Folsom's failure to conduct this required monthly Wet Season visual monitoring extends back to at least February 8, 2008.  Folsom's failure to conduct this required monthly Wet Season visual monitoring has caused and continues to cause multiple, separate and ongoing violations of the General Permit and the Act.

**3.      Folsom Has Failed to Collect Storm Water Samples From Each Discharge Point During at Least Two Rain Events In Each of the Last Five Years.**

Section B(5) of the General Industrial Storm Water Permit requires facility operators to collect storm water samples from "[a]ll storm water discharge locations" during at least two qualifying storm events each wet season.  General Permit § B(5)(a).  CSPA is informed and believes that Folsom has failed to collect storm water samples from all discharge points during at least two qualifying rain events at the Facility during the past five years, as required by the General Permit.

Folsom's failure to conduct this required sampling extends back to at least February 8, 2008.  Folsom's failure to conduct this required sampling has caused and continues to cause multiple, separate and ongoing violations of the General Permit and the Act.

**4.      Folsom Is Subject to Penalties for Its Failure to Implement an Adequate Monitoring & Reporting Plan Since February 8, 2008.**

CSPA is informed and believes that publicly available documents demonstrate Folsom's consistent and ongoing failure to implement an adequate Monitoring Reporting Plan in violation of Section B of the General Permit.  Folsom's above-described failures to sample at least two qualifying storm events in the last five years or report monthly visual observations of storm water discharge are not the Facility's only violations of the

Case 2:13-cv-00840-GEB-DAD   Document 21   Filed 05/01/15   Page 60 of 72
Notice of Violation and Intent To File Suit
February 8, 2013
Page 19 of 24

General Permit's monitoring and reporting requirements, they are merely examples of some of Folsom's violations of the General Permit.

Additionally, Folsom is in violation of the General Permit's requirement that the testing method employed in laboratory analyses of pollutant concentrations present in storm water discharged from the Facility be "adequate to satisfy the objectives of the monitoring program." General Permit Section B.10.a.iii. The Regional Board has determined appropriate tests and detection limits that should be applied when testing for pollutant parameters.

However, as demonstrated by Folsom's annual report filed in 2011-2012, the laboratory employed by Folsom to analyze the storm water sample collected for both samples applied an inappropriate lab method of EPA 6010B for aluminum, instead of EPA 200.8. Further, the laboratory applied an inappropriately high detection limit of .05 mg/L for aluminum, instead of the appropriate detection level of 0.0005 mg/L. In fact, Folsom used an inappropriate analysis method and detection limit for most parameters in all five of the last Annual Reports.

Folsom is in violation of the General Permit for failing to employ laboratory test methods and detection limits that are adequate to, among other things, "ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in this General Permit." General Permit Section B.2.a. ("Monitoring Program Objectives").

Accordingly, consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Folsom is subject to penalties for these violations of the General Permit and the Act since February 8, 2008.

## C.  Folsom Has Failed to Implement BAT and BCT.

Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8). CSPA's investigation indicates that Folsom has not implemented BAT and BCT at the Facility for its discharges of Chemical Oxygen Demand (COD), Biological Oxygen Demand (BOD), Oil and Grease (O&G), Total Suspended Solids (TSS) and Specific Conductance (SC) and other unmonitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

To meet the BAT/BCT requirement of the General Permit, Folsom must evaluate all pollutant sources at the Facility and implement the best structural and non-structural management practices economically achievable to reduce or prevent the discharge of pollutants from the Facility. Based on the limited information available regarding the

Notice of Violation and Intent To File Suit
February 8, 2013
Page 20 of 24

internal structure of the Facility, CSPA believes that at a minimum Folsom must improve its housekeeping practices, store materials that act as pollutant sources under cover or in contained areas, treat storm water to reduce pollutants before discharge (e.g., with filters or treatment boxes), and/or prevent storm water discharge altogether. Folsom has failed to adequately implement such measures.

Folsom was required to have implemented BAT and BCT by no later than October 1, 1992. Therefore, Folsom has been in continuous violation of the BAT and BCT requirements every day since October 1, 1992, and will continue to be in violation every day that it fails to implement BAT and BCT. Folsom is subject to penalties for violations of the General Permit and the Act occurring since February 8, 2008.

**D.      Folsom Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.**

Section A(1) and Provision E(2) of the General Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992. Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to Water Quality Order No. 97-03-DWQ to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 9, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Permit, Section A(2)). The SWPPP must also include BMPs that achieve BAT and BCT (Effluent Limitation B(3)). The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (General Permit, Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of significant materials handled and stored at the site (General Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water

Notice of Violation and Intent To File Suit
February 8, 2013
Page 21 of 24

discharges, including structural BMPs where non-structural BMPs are not effective
(General Permit, Section A(7), (8)).  The SWPPP must be evaluated to ensure
effectiveness and must be revised where necessary (General Permit, Section A(9),(10)).
Receiving Water Limitation C(3) of the Order requires that dischargers submit a report to
the appropriate Regional Water Board that describes the BMPs that are currently being
implemented and additional BMPs that will be implemented to prevent or reduce the
discharge of any pollutants causing or contributing to the exceedance of water quality
standards.

CSPA's investigation and review of available documents regarding conditions at
the Facility indicate that Folsom has been operating with an inadequately developed or
implemented SWPPP in violation of the requirements set forth above.  Folsom has failed
to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary.
Accordingly, Folsom has been in continuous violation of Section A(1) and Provision E(2)
of the General Permit every day since October 1, 1992, and will continue to be in
violation every day that it fails to develop and implement an effective SWPPP.  Folsom is
subject to penalties for violations of the Order and the Act occurring since February 8,
2008.

**E.      Folsom Has Failed to Address Discharges Contributing to
         Exceedances of Water Quality Standards.**

Receiving Water Limitation C(3) requires a discharger to prepare and submit a
report to the Regional Board describing changes it will make to its current BMPs in order
to prevent or reduce the discharge of any pollutant in its storm water discharges that is
causing or contributing to an exceedance of water quality standards.  Once approved by
the Regional Board, the additional BMPs must be incorporated into the Facility's
SWPPP.  The report must be submitted to the Regional Board no later than 60-days from
the date the discharger first learns that its discharge is causing or contributing to an
exceedance of an applicable water quality standard.  Receiving Water Limitation C(4)(a).
Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report
any noncompliance.  *See also* Provision E(6).  Lastly, Section A(9) of the Permit requires
an annual evaluation of storm water controls including the preparation of an evaluation
report and implementation of any additional measures in the SWPPP to respond to the
monitoring results and other inspection activities.

As indicated above, Folsom is discharging elevated levels of Aluminum (Al), Iron
(Fe), Zinc (Zn), Nitrate + Nitrite Nitrogen (N+N), pH, Copper (Cu), Beryllium (Be),
Total Suspended Solids (TSS) and Specific Conductance (SC) and other unmonitored
pollutants that are causing or contributing to exceedances of applicable water quality
standards.  For each of these pollutant exceedances, Folsom was required to submit a
report pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware
of levels in its storm water exceeding the EPA Benchmarks and applicable water quality
standards.

Notice of Violation and Intent To File Suit
February 8, 2013
Page 22 of 24

     Based on CSPA's review of available documents, Folsom was aware of high levels of these pollutants prior to February 8, 2008. Likewise, Folsom has generally failed to file reports describing its noncompliance with the General Permit in violation of Section C(11)(d). Lastly, the SWPPP and accompanying BMPs do not appear to have been altered as a result of the annual evaluation required by Section A(9). Folsom has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the General Permit every day since February 8, 2008, and will continue to be in violation every day it fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include approved BMPs. Folsom is subject to penalties for violations of the General Permit and the Act occurring since February 8, 2008.

### F.    Folsom Has Failed to File Timely, True and Correct Reports.

     Section B(14) of the General Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Permit, Sections B(14), C(9), (10). Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit. *See also* General Permit, Sections C(9) and (10) and B(14).

     Based upon its review of publicly available documents, CSPA is informed and believes that Folsom has submitted late, incomplete and/or false Annual Reports and purported to comply with the General Permit despite significant noncompliance at the Facility. For example, Folsom reported in its 2009-2010 Annual Report that it collected storm water discharge samples during two qualifying storm events. However, based on CSPA's review of publically available rainfall data, CSPA believes that is not true.

     In its 2009-2010 Annual Report, Folsom reported having collected storm water discharge samples during a qualifying storm event at the Facility on November 20, 2009. However, publicly available precipitation data for Represa demonstrates that it rained at least 0.08" in Represa two days prior to November 20, 2009. CSPA believes that 0.08" of rain falling on the Facility on any given day would cause storm water to discharge from the Facility because Folsom sampled a storm event during which 0.08" of rain fell on the Facility on October 16, 2007. Accordingly, because storm water discharged from the Facility two days prior, the storm that occurred at the Facility on November 20, 2009 was likely rendered a non-qualifying storm event.

     Additionally, Folsom reported in its 2011-2012 Annual Report that it collected storm water discharge samples and conducted its required monthly visual observation of storm water discharges on January 20, 2012. However, publicly available rainfall data for Represa demonstrates that the storm event on this date was not a qualifying storm event. Specifically, on January 20, 2012 rain data indicates that 1.28" of rain fell on the Facility, but 0.2" of rain fell on the Facility one day prior, on January 19, 2012. The

Notice of Violation and Intent To File Suit
February 8, 2013
Page 23 of 24

storm event on January 19, 2012 likely makes the storm event on January 20, 2012 not a qualifying storm event.

These are only a few examples of how Folsom has failed to file completely true and accurate reports.  As indicated above, Folsom has failed to comply with the General Permit and the Act consistently for at least the past five years; therefore, Folsom has violated Sections A(9)(d), B(14) and C(9) & (10) of the General Permit every time Folsom submitted an incomplete or incorrect annual report that falsely certified compliance with the Act in the past years.  Folsom's failure to submit true and complete reports constitutes continuous and ongoing violations of the Permit and the Act.  Folsom is subject to penalties for violations of Section (C) of the General Permit and the Act occurring since February 4, 2008.

**IV.     Persons Responsible for the Violations.**

CSPA puts California Department of Corrections & Rehabilitation, Joseph Franz, Jeffrey Beard, Michael E. Knowles and Nancy Spong under on notice that they are the persons responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts California Department of Corrections & Rehabilitation, Joseph Franz, Jeffrey Beard, Michael E. Knowles and Nancy Spong on notice that it intends to include those persons in this action.

**V.     Name and Address of Noticing Party.**

Our name, address and telephone number is as follows:  California Sportfishing Protection Alliance, Bill Jennings, Executive Director; 3536 Rainier Avenue, Stockton, CA 95204; Phone: (209) 464-5067.

**VI.     Counsel.**

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

| | |
|---|---|
| Andrew L. Packard | Tel. (707) 763-7227 |
| Erik M. Roper | Fax. (707) 763-9227 |
| Emily J. Brand | Email: |
| Law Offices of Andrew L. Packard |   Andrew@PackardLawOffices.com |
| 100 Petaluma Boulevard, Suite 301 |   Erik@PackardLawOffices.com |
| Petaluma, CA 94952 |   Emily@PackardLawOffices.com |

Notice of Violation and Intent To File Suit
February 8, 2013
Page 24 of 24

**VII.    Penalties.**

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act California Department of Corrections & Rehabilitation, Joseph Franz, Jeffrey Beard, Michael E. Knowles and Nancy Spong to a penalty of up to $32,500 per day per violation for all violations occurring after March 15, 2004, and $37,500 per day per violation for all violations occurring after January 12, 2009, during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against California Department of Corrections & Rehabilitation, Joseph Franz, Jeffrey Beard, Michael E. Knowles and Nancy Spong and their agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

## SERVICE LIST

Lisa Jackson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Jared Blumenfeld
Administrator, U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Eric Holder
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Dorothy R. Rice, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Pamela Creedon, Executive Officer
Regional Water Quality Control Board
Central Valley Region
11020 Sun Center Drive #200
Rancho Cordova, CA 95670-6114

**ATTACHMENT A**
**Notice of Intent to File Suit, California Department of Corrections (Represa, CA)**
**Significant Rain Events,\* February 8, 2008 – February 8, 2013**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Feb. | 02 | 2008 | Dec. | 07 | 2009 | Dec. | 04 | 2010 | Oct. | 06 | 2011 |
| Feb. | 03 | 2008 | Dec. | 11 | 2009 | Dec. | 05 | 2010 | Oct. | 10 | 2011 |
| Feb. | 19 | 2008 | Dec. | 12 | 2009 | Dec. | 06 | 2010 | Nov. | 05 | 2011 |
| Feb. | 20 | 2008 | Dec. | 13 | 2009 | Dec. | 08 | 2010 | Nov. | 20 | 2011 |
| Feb. | 21 | 2008 | Dec. | 21 | 2009 | Dec. | 14 | 2010 | Nov. | 24 | 2011 |
| Feb. | 22 | 2008 | Dec. | 27 | 2009 | Dec. | 17 | 2010 | Dec. | 15 | 2011 |
| Feb. | 23 | 2008 | Jan. | 08 | 2010 | Dec. | 18 | 2010 | Jan. | 19 | 2012 |
| Feb. | 24 | 2008 | Jan. | 12 | 2010 | Dec. | 19 | 2010 | Jan. | 20 | 2012 |
| Mar. | 28 | 2008 | Jan. | 13 | 2010 | Dec. | 22 | 2010 | Jan. | 21 | 2012 |
| Apr. | 23 | 2008 | Jan. | 17 | 2010 | Dec. | 25 | 2010 | Jan. | 22 | 2012 |
| Oct. | 31 | 2008 | Jan. | 18 | 2010 | Dec. | 26 | 2010 | Jan. | 23 | 2012 |
| Nov. | 26 | 2008 | Jan. | 19 | 2010 | Dec. | 28 | 2010 | Feb. | 01 | 2012 |
| Dec. | 08 | 2008 | Jan. | 20 | 2010 | Dec. | 29 | 2010 | Feb. | 13 | 2012 |
| Dec. | 14 | 2008 | Jan. | 21 | 2010 | Jan. | 01 | 2011 | Feb. | 29 | 2012 |
| Dec. | 15 | 2008 | Jan. | 22 | 2010 | Jan. | 02 | 2011 | Feb. | 29 | 2012 |
| Dec. | 16 | 2008 | Jan. | 25 | 2010 | Jan. | 13 | 2011 | Mar. | 01 | 2012 |
| Dec. | 21 | 2008 | Feb | 04 | 2010 | Jan. | 29 | 2011 | Mar. | 13 | 2012 |
| Dec. | 24 | 2008 | Feb | 05 | 2010 | Jan. | 30 | 2011 | Mar. | 14 | 2012 |
| Dec. | 25 | 2008 | Feb. | 06 | 2010 | Feb. | 15 | 2011 | Mar. | 15 | 2012 |
| Jan. | 02 | 2009 | Feb. | 08 | 2010 | Feb. | 16 | 2011 | Mar. | 16 | 2012 |
| Jan. | 22 | 2009 | Feb. | 09 | 2010 | Feb. | 17 | 2011 | Mar. | 17 | 2012 |
| Jan. | 23 | 2009 | Feb. | 23 | 2010 | Feb. | 18 | 2011 | Mar. | 18 | 2012 |
| Jan. | 24 | 2009 | Feb. | 24 | 2010 | Feb. | 19 | 2011 | Mar. | 25 | 2012 |
| Feb. | 06 | 2009 | Feb. | 26 | 2010 | Feb. | 24 | 2011 | Mar. | 27 | 2012 |
| Feb. | 08 | 2009 | Feb. | 27 | 2010 | Feb. | 25 | 2011 | Mar. | 28 | 2012 |
| Feb. | 06 | 2009 | Mar. | 02 | 2010 | Mar. | 02 | 2011 | Mar. | 21 | 2012 |
| Feb. | 11 | 2009 | Mar. | 03 | 2010 | Mar. | 06 | 2011 | April | 03 | 2012 |
| Feb. | 12 | 2009 | Mar. | 10 | 2010 | Mar. | 13 | 2011 | April | 04 | 2012 |
| Feb. | 13 | 2009 | Mar. | 12 | 2010 | Mar. | 14 | 2011 | April | 11 | 2012 |
| Feb. | 14 | 2009 | Mar. | 25 | 2010 | Mar. | 15 | 2011 | April | 12 | 2012 |
| Feb. | 15 | 2009 | Mar. | 30 | 2010 | Mar. | 16 | 2011 | April | 13 | 2012 |
| Feb. | 16 | 2009 | Mar. | 31 | 2010 | Mar. | 18 | 2011 | April | 25 | 2012 |
| Feb. | 17 | 2009 | April | 02 | 2010 | Mar. | 19 | 2011 | April | 26 | 2012 |
| Feb. | 22 | 2009 | April | 04 | 2010 | Mar. | 20 | 2011 | Oct. | 09 | 2012 |
| Feb. | 23 | 2009 | April | 05 | 2010 | Mar. | 21 | 2011 | Oct. | 22 | 2012 |
| Feb. | 26 | 2009 | April | 11 | 2010 | Mar. | 23 | 2011 | Oct. | 23 | 2012 |
| Mar. | 01 | 2009 | April | 12 | 2010 | Mar. | 24 | 2011 | Nov | 01 | 2012 |
| Mar. | 02 | 2009 | April | 20 | 2010 | Mar. | 25 | 2011 | Nov | 08 | 2012 |
| Mar. | 03 | 2009 | April | 21 | 2010 | Mar. | 26 | 2011 | Nov | 09 | 2012 |
| Mar. | 04 | 2009 | April | 27 | 2010 | Apr | 19 | 2011 | Nov | 17 | 2012 |
| Mar. | 22 | 2009 | May | 10 | 2010 | Apr | 21 | 2011 | Nov | 18 | 2012 |
| Apr. | 07 | 2009 | May | 25 | 2010 | Apr | 25 | 2011 | Nov | 20 | 2012 |
| Apr. | 08 | 2009 | May | 16 | 2010 | May | 09 | 2011 | Nov | 21 | 2012 |
| Apr. | 09 | 2009 | May | 27 | 2010 | May | 15 | 2011 | Nov | 28 | 2012 |
| Apr. | 10 | 2009 | Oct. | 17 | 2010 | May | 17 | 2011 | Nov | 29 | 2012 |
| May | 01 | 2009 | Oct. | 23 | 2010 | May | 25 | 2011 | Nov | 30 | 2012 |
| May | 02 | 2009 | Oct. | 24 | 2010 | May | 28 | 2011 | Dec | 01 | 2012 |
| May | 03 | 2009 | Oct. | 30 | 2010 | May | 29 | 2011 | Dec | 02 | 2012 |
| May | 04 | 2009 | Nov. | 07 | 2010 | Jun | 01 | 2011 | Dec | 05 | 2012 |
| May | 05 | 2009 | Nov. | 19 | 2010 | Jun | 04 | 2011 | Dec | 11 | 2012 |
| May | 20 | 2009 | Nov. | 20 | 2010 | Jun | 06 | 2011 | Dec | 17 | 2012 |
| Oct. | 13 | 2009 | Nov. | 23 | 2010 | Jun | 28 | 2011 | Dec | 21 | 2012 |
| Nov. | 18 | 2009 | Nov. | 27 | 2010 | Oct. | 04 | 2011 | Dec | 22 | 2012 |
| Nov. | 20 | 2009 | Dec. | 02 | 2010 | Oct. | 05 | 2011 | Dec | 23 | 2012 |

\* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**ATTACHMENT A**
**Notice of Intent to File Suit, California Department of Corrections (Represa, CA)**
**Significant Rain Events,\* February 8, 2008 – February 8, 2013**

Dec   25   2012
Dec   26   2012
Jan   06   2012
Jan   09   2012
Jan   24   2012
Jan   25   2012

\* Dates gathered from publicly available rain and weather data collected at stations located near the
  Facility.

**EXHIBIT E**

## Exhibit E

Since the receipt of the Regional Water Board Order and CSPA's Notice Letter and Complaint, Defendant has been evaluating existing BMPs and establishing improved BMPs.  Over the past year or more, regular site visits and inspections have occurred regarding operations around the Facility and a number of BMPs have been modified and/or established for certain programs and operations, as appropriate, in order to try to reduce or eliminate storm water discharges containing the pollutants listed in **Exhibit C** to the Agreement.  As of the date of this Agreement, the following specific BMPs have been implemented, or are in the process of being implemented, at the Facility:

1.      Defendant has installed 112 storm drain inlet filters and/or wattles at strategic locations (see **Exhibit F** to the Agreement).

2.      Facility staff, PIA staff, and relevant inmates have received training regarding improved housekeeping practices related to Industrial Activities, including the prohibition of dumping of any liquids or solids of any type into storm drain inlets.

3.      Covering of metal stock and scrap at the Industrial Areas, including Plant Operations and PIA facilities, commenced in the fall of 2013 and is ongoing.  This work includes construction of permanent structures to protect metal materials from coming into contact with precipitation or storm water.

4.      Sweeping/Vacuum Truck Services have been contracted for and allows for up to 40 hours of regenerative sweeping/vacuuming in the current fiscal year with a hepa-vacuum mounted attachment. The primary areas of the facility will be roadways and surfaces in and around the Industrial Areas. A contract for an additional two years is in process.

5.      Defendant is actively working to reduce the Canadian goose population at the Facility and has advised Facility staff and inmates about the goose/storm water issues and to not feed the geese.  Clean up and removal of goose feces in areas heavily populated with geese has commenced and is ongoing.  A permit from the California Department of Fish and Wildlife was obtained in March 2014 to commence Canada goose nest and egg addling and destruction, and a depredation permit from the United States Fish and wildlife Service was received in April 2014.  To date, 22 nests totaling 110 eggs have been addled and efforts to reduce the Canadian goose population are ongoing.  In addition, over the past two years, Facility staff have attempted several other BMPs to rid the facilities of geese, including the use of dogs and hawks to scare away the birds, and electronic bird repellers designed to emit audible predatory recordings designed to keep birds from landing near them. The purchase of visual scare devices, such as coyote decoys, is in process.

6.      A daily clean-up schedule for welding programs has been implemented for all areas at the Facility where welding occurs, and includes sweeping and disposal of the metal grinding dust and welding slag.

7.       The Quonset storage area adjacent to Outfall A-2 has been cleaned of all debris and sediment, all stored metal has been moved off the ground and is stored on shelving that is approximately two (2) feet or more above ground, and the roof has been repaired to prevent any leaks of precipitation or storm water onto the stored metal materials.

8.      Daily clean-up procedures have been implemented to clean or remove metal dust or debris associated with the Industrial Activities.

9.      A break in a wall where the vocational masonry program is conducted in the Lower Yard Hanger was repaired in or about December 2013 to prevent the flow of contaminated masonry water to the storm drain system.

10.     A storm water/geological consultant has been retained to provide a comprehensive assessment of the possible sources of the pollutants that caused or contributed to the exceedances of the EPA parameter benchmark values that were the subject of the Regional Water Board Order and to recommend improved BMPs to reduce or eliminate such discharges to below applicable EPA parameter benchmark values.  This evaluation process is ongoing.

11.     The Facility has conducted an investigation of some inlets to Outfall B to locate and identify potential source(s) of human-related Nitrate discharges, including groundwater inputs and whether there are additional drain inlet inputs.  Defendant has conducted a physical investigation of the Outfall B tunnel (known as "Godwin Tunnel") and collected Nitrate and fecal coliform samples from Outfall B at lateral tie-in locations and obtained a sample (with a bailer or pump hose) from the vertical deep shaft on the southeast side of the prisoner housing complexes.  Following the initial physical inspection, a subsequent inspection of the Outfall B tunnel was conducted and no cross-connections were observed that would contribute to the source of Nitrates in the storm water; however, an underground leak in the potable hot water system that services Building 5 was identified and repaired.

## <u>ORDER</u>

Good cause appearing, and the Parties having stipulated and agreed,

IT IS HEREBY ORDERED that Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE's claims against Defendant JEFFREY BEARD, in his official capacity as Secretary of the California Department of Corrections and Rehabilitation, as set forth in CSPA's 60-Day Notice Letter and Complaint, are hereby dismissed with prejudice, each side to bear their own attorney fees and costs, except as provided for by the terms of the accompanying Consent Judgment.

IT IS FURTHER ORDERED that the Court shall retain and have jurisdiction over the Parties solely for the purpose of resolving disputes arising under the Consent Judgment attached to the Parties' Stipulation to Dismiss as Exhibit A until September 30, 2017.

IT IS SO ORDERED.


Dated: _____          _____
                                  HON. GARLAND E. BURRELL, JR.
                                  UNITED STATES DISTRICT COURT JUDGE

STIPULATION RE DISMISSAL                    Case No. 2:13-CV-00840-GEB-DAD